348 F.2d 954
 C. J. MONTAG & SONS, INC., a Washington Corporation, Carl M. Halvorson, Inc., an Oregon Corporation, Austin Construction Co., a Washington Corporation, Babler Bros., Inc., an Oregon Corporation, and McLaughlin, Inc., a Montana Corporation
v.
The UNITED STATES.
 No. 470-61.
 United States Court of Claims.
 July 16, 1965.
 
 William R. Morse, Absarokee, Mont., attorney of record, for plaintiff.
 Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Edwin J. Reis, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.
 PER CURIAM:
 
 
 1
 This contract case was referred, pursuant to Rule 57(a) (former Rule 45(a)), to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendations for a conclusion of law. Commissioner White has done so in an opinion and report filed on April 28, 1964, recommending that judgment be entered for plaintiff for $69,369.72. The defendant has excepted to the recommendation, the opinion, and certain of the findings; the parties have filed briefs; and oral argument before the court has been had. The court agrees with the opinion, findings and recommendation of the trial commissioner. Accordingly, it adopts them, as supplemented by the remainder of this opinion, as the basis for its judgment in this case.
 
 
 2
 Defendant urges that plaintiff knew, before it bid, of the alleged "discrepancy" in subparagraph g of paragraph 8-19 of the contract's technical provisions, and therefore should, under Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963), have taken the matter up with the contracting officer. But in this case there was not "a patent and glaring discrepancy" or an "obvious omission, inconsistency, or discrepancy of significance," as in Beacon Construction Company. Here there was simply a possible latent ambiguity which plaintiff reasonably read, as it could, as allowing it payment for all steel bars used for bracing. This was not the type of gross discrepancy which the contractor was required to put up to the contracting officer before bidding. See Blount Bros. Constr. Co. v. United States, Ct.Cl., 346 F.2d 962, decided June 11, 1965; Wingate Constr. Co. v. United States, Ct.Cl., No. 394-60, decided Jan. 24, 1964; WPC Enterprises, Inc. v. United States, Ct.Cl., 323 F.2d 874, decided Oct. 11, 1963.*
 
 OPINION OF COMMISSIONER
 
 3
 This case involves the interpretation of a sentence in a 1957 contract covering the construction by the plaintiffs, a joint venture, of the south shore portion of the Ice Harbor Dam, which was built across the Snake River at a point approximately 12 miles southeast of Pasco, Washington. The crucial sentence stated that:
 
 
 4
 Bars used for bracing will be paid for at the contract unit price for Item No. 55, "Steel reinforcement, structural grade." The problem is whether the quoted sentence, as properly interpreted, referred to all "Bars used for bracing," or only to certain "Bars used for bracing." For an adequate understanding of this problem, it is necessary to outline in some detail the nature of the construction that was contemplated when the defendant drafted, and the plaintiffs bid on, the instrument which ultimately was to become the contract between the parties.
 
 
 5
 The Ice Harbor Dam was to be constructed of concrete, reinforced with steel bars. The steel bars to be used for reinforcing the concrete were shown on the drawings that formed part of the proposed contract, and they were to constitute a major portion of the total project.
 
 
 6
 The ordinary method of installing steel reinforcing bars on such a project involves the fabrication of gridworks of bars, horizontally and vertically. Such gridworks are made rigid and held in place by means of supports, ties, and braces.
 
 
 7
 Bracing is of two kinds, temporary and permanent. Temporary bracing provides a temporary skeleton for the reinforcing steel that is to be used in a particular pour of concrete; and it is arranged so that, after the concrete is poured, the temporary bracing can be removed. Permanent bracing holds the reinforcing steel in place during a pour of concrete. Such bracing remains permanently connected to the reinforcing steel, and, therefore, becomes a permanent part of the structure after the concrete is poured. Steel bars, similar to those used in reinforcing the concrete, are frequently used as permanent braces for the steel reinforcement.
 
 
 8
 The Ice Harbor Dam was ultimately to include six powerhouse units, but only three of these units were to be completed under the proposed contract. The substructure for the other three units, referred to as skeleton bays, was to be constructed under the proposed contract, but it was anticipated that these powerhouse units would be completed under another contract sometime in future years. In the meantime, after the construction of the substructure for the three skeleton bays under the proposed contract, and pending the ultimate completion of the skeleton bays under a future contract, these bays were to be used for the diversion of the river.
 
 
 9
 In anticipation that the substructure in the three skeleton bays would at some future time provide the base for additional portions of the dam, which would similarly be constructed of concrete reinforced with steel bars, the contract drawings relative to the substructure in the skeleton bays indicated that the ends of the steel reinforcing bars which were to comprise the vertical parts of the steel gridworks there would protrude above the concrete. The purpose of this was to make it possible for the protruding ends of the steel reinforcing bars to be welded or bonded in the future to the steel bars that would provide the reinforcement for the concrete in the additional portions of the dam, whenever the skeleton bays might be completed.
 
 
 10
 In the area of the skeleton bays where it was expected that the protruding ends of the vertical steel reinforcing bars would be subjected to a high degree of turbulence from the water of the diverted river, the contract drawings indicated that such bars were to protrude above the concrete for only a few inches, and that such protruding ends were to consist of structural grade steel. However, in the area of the skeleton bays where it was anticipated that the turbulence from the water of the diverted river would not be severe, the contract drawings indicated that the vertical steel reinforcing bars were to protrude above the concrete for the full bond distance, that such bars were to be of intermediate grade steel, and that the protruding ends were to be permanently braced above the concrete with other bars of intermediate grade steel. The amount of the permanent bracing shown on the contract drawings as supporting the protruding ends of the steel reinforcing bars in the skeleton bays was relatively small.
 
 
 11
 The reinforcing bars of structural grade steel referred to in the first sentence of the preceding paragraph as protruding above the concrete in the skeleton bays for a few inches constituted the only steel reinforcement of structural grade shown on the contract drawings. It was estimated by the defendant — and the proposed contract so indicated — that the steel reinforcement of structural grade would total 42,000 pounds of structural grade steel. All the other steel reinforcement provided for in the contract drawings was shown to be of intermediate grade steel; and it was estimated that a total of 34,930,000 pounds of intermediate grade steel would be required for this purpose.
 
 
 12
 The permanent bracing above the concrete in the skeleton bays was the only bracing shown on the contract drawings. Hence, with respect to all the bracing that was to be imbedded in the concrete, it was clear from the provisions of the proposed contract that the person performing the contract could determine the type, placement, and quantity of the bracing to be used, subject to the authority of the defendant's inspectors on the job to refuse to approve a pour of concrete if they should determine that the bracing used by the contractor was inadequate.
 
 
 13
 Perhaps it should be mentioned at this point that, generally, in the concrete construction industry bracing for steel reinforcement is not shown on contract drawings and is not included in such contracts as a pay item separate and apart from the steel reinforcement. Consequently, it is the customary practice in the industry for bidders to include the anticipated cost of the bracing in figuring their bids on the steel reinforcement.
 
 
 14
 Although no bracing was shown on the contract drawings in the present case (except for the relatively small quantity of bracing that was shown as being above the concrete in the skeleton bays), it was obvious to persons of experience in the industry — such as the plaintiffs — that several hundred thousand pounds of permanent bracing would be required on a job of such magnitude as the south shore portion of the Ice Harbor Dam.
 
 
 15
 The unit price schedule in the proposed contract for the construction of the south shore portion of the Ice Harbor Dam contained two items, Nos. 54 and 55, that are of special importance in connection with the present litigation. The references to these items in the proposed contract were as follows:
 
 
 16
 --------------------------------------------------------------------------
 Item | Estimated | Unit | Description | Unit | Estimated
 no. | quantities | | | price | amount
 --------------------------------------------------------------------------
 * * * * * * *
 54 | 34,930,000 | Lb. | Steel reinforcement, | | .........
 | | | intermediate grade. | ...... |
 55 | 42,000 | Lb. | Steel reinforcement, | | .........
 | | | structural grade. | ...... |
 --------------------------------------------------------------------------
 
 
 17
 The matter of supporting the steel reinforcement was dealt with in subparagraph g of paragraph 8-19 of the technical provisions of the proposed contract. That paragraph stated as follows:
 
 
 18
 g. Supports. — All reinforcement shall be secured in place by use of metal or concrete supports, spacers or ties, as approved. Such supports shall be of sufficient strength to maintain the reinforcement in place throughout the concreting operation. The supports shall be used in such manner that they will not be exposed or contribute in any way to the discoloration or deterioration of the concrete. Where called for on the drawings, reinforcing bars left projecting from concrete surfaces for bonding to future work shall be braced with, and welded to, other bars. Bars used for bracing will be paid for at the contract unit price for Item No. 55, "Steel reinforcement, structural grade." No separate payment will be made for welding, but all costs in connection therewith shall be considered incident to and included in the cost of furnishing and placing the reinforcement. [Emphasis supplied.]
 
 
 19
 The evidence shows that when the defendant included the italicized sentence in subparagraph g, the defendant intended to refer only to the bracing mentioned in the preceding sentence of the subparagraph (i. e., the bracing shown on the contract drawings as being above the concrete in the skeleton bays). On the other hand, the evidence also shows that when the plaintiffs were considering the submission of a bid on the proposed contract and were determining the amount of their bid, the plaintiffs understood the italicized sentence in subparagraph g as meaning that the defendant, contrary to the customary practice, would pay for all steel bars used as permanent bracing, and that the unit price for such bracing would be the price agreed upon for Item No. 55. Because of their understanding, the plaintiffs did not include the cost of the steel bars to be used as permanent bracing in calculating their bids on the steel reinforcement under Items Nos. 54 and 55 of the proposed contract. The plaintiffs' unit-price bid on Item No. 54 of the proposed contract was 14 cents per pound, and the plaintiffs' unit-price bid on Item No. 55 was also 14 cents per pound.
 
 
 20
 The plaintiffs' bid on the proposed contract was accepted by the defendant; and on January 4, 1957, the plaintiffs entered into a written contract with the defendant for the construction of the south shore portion of the Ice Harbor Dam. The original estimated amount of the entire contract was $29,475,396.90. In the formal contract, the figure ".14" was inserted as the unit price for Item No. 54; and the figure "$4,890,200.00" was inserted as the estimated amount of this item. Similarly, the figure ".14" was inserted in the contract as the unit price for Item No. 55; and the figure "$5,880.00" was inserted as the estimated amount of this item.
 
 
 21
 At the time when the parties entered into the contract, they had different understandings with respect to the meaning and scope of the sentence in subparagraph g of paragraph 8-19 of the technical provisions of the contract which stated that "Bars used for bracing will be paid for at the contract unit price for Item No. 55 * * *." It was the understanding of the plaintiffs that the quoted sentence applied to all steel bars used as permanent bracing. On the other hand, it was the defendant's understanding that the quoted sentence applied only to certain steel bars used as permanent bracing (i. e., the steel bars used as permanent bracing above the concrete in the skeleton bays, as shown on the contract drawings).
 
 
 22
 Early in the performance of the work under the contract, a controversy arose between the parties as to whether all steel bars used as permanent bracing in connection with the steel reinforcement were to be paid for by the defendant. The plaintiffs asserted that the defendant was required to pay for all such bracing pursuant to the sentence in subparagraph g of paragraph 8-19 of the technical provisions of the contract which stated that "Bars used for bracing will be paid for at the contract unit price for Item No. 55 * * *." On the other hand, the defendant's representative in charge of making payments under the contract expressed the opinion that the quoted sentence referred only to the steel bars mentioned in the preceding sentence of subparagraph g (i. e., the steel bars used as bracing above the concrete in the skeleton bays, as shown on the contract drawings).
 
 
 23
 The view of the defendant's representative, as outlined in the preceding paragraph, was upheld by higher authority in the administrative agency. Consequently, at the time of the completion of the contract, the plaintiffs were demanding payment — and the defendant was refusing to pay — for 495,498 pounds of steel bars used as permanent bracing for the steel reinforcement in the concrete. The plaintiffs' claim in the amount of $69,369.72 (495,498 pounds of steel bracing at 14 cents per pound) is now before the court for determination.[1]
 
 
 24
 The defendant has paid the plaintiffs for the steel bars that were used as permanent bracing above the concrete in the skeleton bays, as shown on the contract drawings.[2]
 
 
 25
 Was it unreasonable for the plaintiffs, when they submitted their bid and entered into the contract, to believe that the sentence, "Bars used for bracing will be paid for at the contract unit price for Item No. 55 * * *," was meant to cover all steel bars used as permanent bracing? It seems to me that the quoted sentence was reasonably susceptible of such an interpretation.
 
 
 26
 Since the defendant, in drafting the crucial sentence, did not employ any word or phrase of limitation in connection with the word "Bars" other than the phrase "used for bracing," the plaintiffs were not necessarily required, in my opinion, to restrict the scope of the sentence themselves by reading an additional limitation into the reference to "Bars used for bracing." I believe, therefore, that there was a reasonable basis for the plaintiffs' conclusion that the quoted sentence referred to all steel bars used as permanent bracing. The plaintiffs' understanding in this respect drew some support from the circumstance that subparagraph g, in which the crucial sentence appeared, specifically stated at the end that "No separate payment will be made for welding," but did not similarly negative in express terms the making of separate payments for steel bars used as permanent bracing.
 
 
 27
 This is not to say that the plaintiffs' interpretation was the only reasonable one. On the contrary, when the crucial sentence was read in context as part of the entire subparagraph g, it could very well have been understood that the reference in the crucial sentence to "Bars used for bracing" was intended to refer only to the bars mentioned in the preceding sentence of subparagraph g (i. e., the bars shown on the contract drawings as bracing above the concrete in the skeleton bays).
 
 
 28
 It will be noted that subparagraph g first discussed the subject of supports generally, and then turned to the matter of bracing. The term "support" is broader than the term "brace," a brace being a special type of support. When subparagraph g turned from the broad subject of supports to the more limited matter of bracing, it first stated that "Where called for on the drawings, reinforcing bars left projecting from concrete surfaces for bonding to future work shall be braced with, and welded to, other bars." The next sentence in subparagraph g then stated that "Bars used for bracing will be paid for at the contract unit price for Item No. 55 * * *." Since these two sentences constituted the only express references to bracing in subparagraph g, it would have been logical for a perceptive person to regard the two sentences as being related to each other, and to understand the phrase "Bars used for bracing" in the second quoted sentence as referring specifically to the bars mentioned in the first quoted sentence as being used in accordance with the contract drawings to brace the reinforcing bars left projecting from concrete surfaces for bonding to future work. Furthermore, such an understanding would have been consistent with the custom in the concrete construction industry whereby bracing generally is not shown on contract drawings and is not paid for separate and apart from the steel reinforcement.
 
 
 29
 Thus, we are dealing with a contract provision which was susceptible of being interpreted — and which the parties to the contract actually interpreted — in two different ways, one favorable to the plaintiffs and the other favorable to the defendant. In this situation, it appears that the proper rule to follow was stated by the court in the case of Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947):
 
 
 30
 * * * Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions. * * *
 
 
 31
 A textbook statement of this rule is found in 3 Williston, Contracts (rev. ed.), § 621, p. 1788:
 
 
 32
 * * * Since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved in favor of the latter * * *.
 
 
 33
 As the contract provision involved in the present litigation was drafted by the defendant and not by the plaintiffs, the interpretation favorable to the plaintiffs is the one that should be adopted. On that basis, it appears that the statement in the contract to the effect that "Bars used for bracing will be paid for at the contract unit price for Item No. 55 * * *" should be regarded as referring to all steel bars used as permanent bracing (the plaintiffs' interpretation), rather than as applying only to certain steel bars used as permanent bracing (the defendant's interpretation).
 
 
 34
 It is my recommendation, therefore, that the court enter a judgment for the plaintiffs in the sum of $69,369.72.
 
 
 
 Notes:
 
 
 *
 Since neither party has preserved an exception to the introduction ofde novo evidence at the trial in this court, the court is free to consider all the evidence in the record. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, Ct.Cl., decided July 12, 1963, and later decisions to the same effect.
 
 
 [1]
 During the course of the performance of the contract, the defendant, at the request of the plaintiffs, relieved the plaintiffs of the requirement that certain of the steel reinforcement should be of structural grade steel. As a result of this change, all the steel reinforcement used in the performance of the contract was of intermediate grade steel, Item No. 55 was deleted from the contract, and Item No. 54 was adjusted upward as to estimated quantity and estimated amount. The price per pound was unaffected by the change
 
 
 [2]
 With the deletion of Item No. 55 from the contract, as indicated in footnote 1, Item No. 54 was regarded as fixing the unit price for these steel bars used as permanent bracing above the concrete in the skeleton bays. No charge was made by the plaintiffs for temporary bracing