Collins, Judge,
delivered the opinion of the court;
In 1955, the U.S. Army Corps of Engineers awarded to plaintiff a contract for the erection of a dam at Letterkenny Ordnance Depot, Pennsylvania. Plaintiff seeks, in the present action, to recover additional compensation for the construction of the spillway bucket* a portion of the dam (described in finding 6(b), infra). The payments which plaintiff received for the concrete used in the spillway bucket were based upon the classification, gravity concrete ($16.25 per cubic yard). According to plaintiff, the concrete in question should have been classified as reinforced concrete ($75 per cubic yard), and plaintiff claims entitlement to the difference between the two classifications. In addition to denying plaintiff’s right to recover, defendant has filed a counterclaim (which is discussed infra).
The facts relevant to plaintiff’s claim can be summarized as follows: Included with the invitation for bids, which was issued in May 1955, was a unit-price schedule that contained *759 estimates of the quantities of materials required. For gravity concrete, the estimate was 21,800 cubic yards; for reinforced concrete, 490. Although the specifications stated that measurement of (and payment for) concrete would be based upon “the actual volume of concrete within the pay lines of the structures as indicated on the drawings,” the originally issued version of the pertinent drawing contained no pay lines. However, on June 7, 1955, the Corps of Engineers sent to all prospective bidders an addendum to the specifications. The addendum provided that three portions of the dam should be shown on the drawing as reinforced concrete, i.e., the spillway training walls, the bucket training walls, and the gate house above elevation 836.0. (See findings 10, 6(c), and 6(d).) Also, the following note was to be added to the drawing: “All concrete will be paid for as Gravity Concrete except spillway and bucket training walls and Gate House above Elev. 836.0 which are classed as Eeinforced Concrete for payment.”
In order to determine the amounts of material needed for the construction, plaintiff’s personnel examined the various contract documents. Also, plaintiff had been represented at the site inspection held on May 31,1955.- With respect to the item of reinforced concrete, plaintiff’s estimator computed a total of 1,415 cubic yards. This amount, which included the concrete in the spillway bucket, was used in preparing plaintiff’s bid. Although recognizing the discrepancy between their estimate and that of the Government (490 cubic yards), plaintiff’s personnel did not, prior to bidding, seek clarification. Plaintiff’s bid was submitted to the Government on June 17,1955, and it was the lowest one with respect to the dam and appurtenant work. On June 24,1955, plaintiff signed its contract and then proceeded with the project.
In March 1957, when the work in question had been completed, plaintiff wrote the Corps of Engineers that the Government had erred in classifying the concrete in the spillway bucket as gravity concrete. After the contracting officer denied its claim for adjustment of the contract price, plaintiff appealed, without success, to the Corps of Engineers Claims and Appeals Board. Subsequently, the Armed Services *760 Board of Contract Appeals (the “ASBCA”) denied plaintiff’s claim regarding the spillway bucket. Then, plaintiff filed the present suit.
Plaintiff contends that its interpretation of the contract was reasonable, in view of the nature of the contract documents and because of the conduct of certain Government representatives. We cannot accept plaintiff’s argument.
Prior to the issuance of the addendum described above, the contract was unclear as to what portions of the dam would be classified as reinforced concrete. The drawings indicated that various parts were to contain reinforcing bars, but this was not decisive. Payment for the bars was separate from that for the concrete. (See finding 4.) The classification of the concrete was to be shown 'by pay lines, but, as stated previously, the original drawing failed to contain such lines. The crucial fact, however, is that this omission was cured by the addendum. The relevant section of the addendum specified the parts which were to be labeled “reinforced concrete” and provided an explanatory note. These additions to the contract made it clear that only the spillway training walls, the bucket training walls, and part of the gate house were classified as reinforced concrete. All other portions of the dam, including the spillway bucket, were to be paid for as gravity concrete.
By limiting attention to the note set forth in the addendum, plaintiff attempts to find an ambiguity. The short answer to this is that, when all pertinent provisions of the addendum are considered, it is clear that the spillway bucket was excluded from the category of reinforced concrete. Since the addendum erased any reasonable doubts regarding classification of the concrete in the spillway bucket, there is no basis for applying the rule that ambiguities should be construed against the Government, the preparer of the contract documents. Thus, the principle stated in WPG Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 6, 323 F. 2d 874 (1963), is of no avail to plaintiff. Contrary to plaintiff’s assertion, our decision in C. J. Montag & Sons, Inc. v. United States, 172 Ct. Cl. 501, 510, 348 F. 2d 954 (1965), is not controlling. The contractual provision which was the subject of the dispute in C. J. Montag & Sons, Inc., was susceptible *761 to two different, but reasonable, interpretations. With regard to tbe present case and tbe matter of tbe spillway bucket, the facts are quite different. The contract, as amended, is such that plaintiff’s interpretation is not a reasonable one.
There is an additional ground for denying plaintiff’s claim. The personnel of plaintiff were aware of the substantial discrepancy between their estimate of the amount of reinforced concrete and the estimate of the Government. Bidders were instructed that requests for explanation of drawings and specifications should be submitted, in writing, prior to bidding. Nonetheless, plaintiff made no effort to comply with this provision. Under these circumstances, defendant is quite correct in relying upon this court’s decision in Beacon, Constr. Co. v. United States, 161 Ct. Cl. 1, 314 F. 2d 501 (1963). There, we discussed a contractual provision which stated:
* * * “In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense.” * * * [161 Ct. Cl. at 6.]
We held that, under such a provision, the bidder was required, when presented with an obvious discrepancy of significance, to “consult the Government’s representatives if he [the bidder] intends to bridge the crevasse in his own favor. Having failed 'to take that route, plaintiff is now barred from recovering on this demand.” 161 Ct. Cl. at 7. The same rule applies to the present case, and the same result must follow.[1] Plaintiff had ample opportunity, before bidding, to seek written clarification, and it should have done so.
Our decision is consistent with that of the ASBCA. There is, however, no need to discuss the question of finality of the ASBCA determination, for defendant acknowledges that the dispute regarding the spillway bucket is essentially a problem of contract interpretation, and defendant has not *762 urged that tbe administrative decision is entitled to finality.[2] Defendant has raised several other reasons for denying plaintiff’s claim, but, in view of the conclusion we have reached, it is unnecessary to discuss them.
THE COUNTERCLAIM
The claim which plaintiff presented to the contracting officer was not limited to the matter of the spillway bucket. In addition, plaintiff sought further compensation for concrete used in certain areas which, according to plaintiff, were included in the “training walls.” With respect to this latter claim, plaintiff succeeded in obtaining relief from the Corps of Engineers. Defendant asserts that the making of the additional payment was erroneous.
The pertinent facts are as follows: On March 21, 1957, plaintiff wrote the contracting officer that it considered the “training walls for entire depth of reinforcing” to be one of the areas which should be paid for as reinforced concrete. The contracting officer rejected plaintiff’s view as to the extent of the “training walls.” His decision, issued on July 12,1957, included the following: “* * * training walls mean that concrete which projects beyond the face of the spillway and bucket structures and not any of the concrete which is within and part of the respective structures.” After the denial of its appeal by the Corps of Engineers Claims and Appeals Board, plaintiff sought review by the ASBCA.
In a decision dated February 12, 1959, the ASBCA held that plaintiff’s interpretation of the meaning of “training walls” was reasonable and that recovery was in order. Subsequently, a dispute arose between plaintiff and the Corps of Engineers as to the amount of recovery. Plaintiff claimed a sum based upon 120.8 cubic yards. When the contracting officer decided that the disputed area consisted of 39.9 cubic yards, plaintiff filed an appeal. The Corps of Engineers *763 transmitted the appeal to the ASBCA which held (1) that its prior decision had not dealt with the issue of quantum and (2) that the matter should be determined initially by the Corps of Engineers. Then, in October 1960, plaintiff’s appeal was referred to the North Atlantic Division of the Corps of Engineers. On January 17, 1961, the division engineer rendered a decision, the effect of which was to compensate plaintiff on the 'basis of 79.9 cubic yards. (See finding 33.) Plaintiff was paid an additional $4,694.12, and this is the amount defendant seeks to recover.
Basically, the position of defendant is that the payment in question resulted from erroneous interpretation of the contract by the ASBCA and the division engineer. Defendant asserts that no part of the disputed areas could properly be considered as “training walls” and that, therefore, plaintiff was not entitled to any additional payment at the reinf orced-concrete rate. Defendant relies, in part, upon Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 371, 312 F. 2d 408 (1963).
We are unable to accept defendant’s argument, for we are of the opinion that plaintiff is correct in asserting that the decision of the division engineer was the result of a valid compromise.[3] Thus, the present case is distinguishable from Flippin Materials Co., supra, which involved not a mutual agreement, but a unilateral decision on the part of a contract appeals board.[4] In Flippin Materials Co., the Government was permitted to recover from the contractor a payment which had been based upon an erroneous decision of the board. In the present case, however, we are unwilling to invalidate the settlement reached by plaintiff and the division engineer.
Defendant differentiates between the “training wall aspects” and the “wing wall aspects” of the payment to plaintiff, but we are not willing to view the payment to plaintiff *764 in the manner defendant proposes. The amount of concrete, regarding which plaintiff sought additional compensation, was 120.8 cubic yards. In part, plaintiff’s claim rested upon the assertion that the wing walls were part of the training walls. Under our view of the facts, the correctness or incorrectness of plaintiff’s interpretation of “training walls” is not decisive. It is sufficient that plaintiff’s claim was made in good faith and was based upon a reasonably tenable ground. Cf. Wm. A. Smith Contr. Co. v. West Central Texas Municipal Water Dist., 344 F. 2d 470 (5th Cir. 1965). There has been no suggestion that plaintiff was acting in bad faith, and the reasonableness of plaintiff’s claim is indicated by the decisions reached by the ASBCA and the division engineer. We conclude, therefore, that the giving up of plaintiff’s disputed claim constituted good consideration and that it would be improper to permit defendant to upset, to any extent, the settlement which plaintiff made. Cf. Goltra v. United States, 119 Ct. Cl. 217, 255, 96 F. Supp. 618 (1951). Also cf. Brock & Blevins Co. v. United States, supra, 170 Ct. Cl. at 58.
Another argument of defendant is that the Corps of Engineers lacked authority to enter into a compromise. Defendant states that, after plaintiff filed the present suit (in 1959), only the Department of Justice 'had authority to effect a compromise. The primary basis for this argument is Executive Order No. 6166 (June 10,1933), which provides in part:
As to any case referred to the Department of Justice for prosecution or defense in the courts, the function of decision whether and in what manner to prosecute, or to defend, or to compromise, * * * now- exercised by any agency or officer, is transferred to the Department of Justice.
The difficulty with defendant’s contention is that it attributes too broad a meaning to the phrase “case referred to the Department of Justice.” The suit which plaintiff commenced in 1959 related only to plaintiff’s spillway-bucket claim. Plaintiff did not include its training-wall claim, since that matter was still pending in administrative channels. It follows, therefore, that the dispute regarding the training walls was not part of the “case referred to the Department of Justice” in 1959. Until its resolution by the compromise, the training-wall dispute continued to be the responsibility *765 of tlie Corps of Engineers. Onr view is not altered by the fact that, in November 1960, the Department of Justice informed plaintiff that, depending upon the outcome of the administrative proceedings, it might file a counterclaim. We hold that the settlement reached in January 1961 was properly authorized and that it is binding upon defendant.
In conclusion, we have determined that both the claim of plaintiff and the counterclaim of defendant must be denied.
FINDINGS OP FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Construction Service Company, a New Jersey corporation located at Bound Brook, New Jersey, is engaged in the general construction business.
2. On June 25, 1955, plaintiff entered into Contract No. DA-18-020-Eng-912 with the defendant for the construction of a dam at the Letterkenny Ordnance Depot, Pennsylvania. This action arises out of that contract.
3. On May 12,1955, plaintiff received an “Advance Notice, Addition to Water Supply System, Letterkenny Ordnance Depot, Pennsylvania” which defendant, through the Office of the District Engineer, Baltimore District, TJ.S. Army Corps of Engineers, had issued to prospective bidders. This Advance Notice included the following pertinent language:
4.PRINCIPAL FEATURES OF THE WORK: The work to be performed includes the following principal features:
(a) Dam and Appurtenant WorJe (Schedule A). Construction of gravity type concrete ogee crest dam, approximately 240 feet long, and 60 feet high containing about 20,000 cubic yards of mass concrete and 2,000 cubic yards of reinforced concrete, with reinforced concrete retaining and abutment walls; foundation drilling and grouting; reinforced concrete gate house constructed integrally with dam, * * *.
The terms “mass concrete” and “gravity concrete” used in the above quoted paragraph are synonymous in general usage. The Advance Notice advised prospective bidders how drawings and specifications could be obtained.
*766 4. Under date of May 18,1955, the District Engineer issued Invitation for Bids (Standard Form 20), Instructions to Bidders (Standard Form 22), Bid Form (Standard Form 21), Unit Price Schedule (Eng. Form 1618), Specifications, and Drawings for the Letterkenny Ordnance Depot project. Plaintiff received an invitation to bid on the contract. The Invitation for Bids notified bidders that the successful bidder would be required to execute the standard contract form for construction (Standard Form 23) and that arrangements had been made for an inspection of the site of the proposed work on May 31,1955. Bidders were urged to visit the site.
The Instructions to Bidders contained the following language:
1. Explanation to Bidders. Any explanation desired by bidders regarding the meaning or mterpretation qf the drawings and specifications must be requested in writing and with sufficient time allowed for a reply to reach them before the submission of their bids. Oral explanations or instructions given before the award, of the contract will not be binding. Any interpretation made will be in the form of an addendum to the specifications or drawings and will be furnished to all bidders and its receipt by the bidder shall be acknowledged.
Standard Form 23-A contained a provision for the specifications to govern the drawings in the event there was a difference in the two. The usual Changes Article and Disputes Article were included in Standard Form 23-A.
The Unit Price Schedule (Eng. Form 1618) provided, in pertinent part:

The pertinent specifications provided:
* * :i: * *
Part III. Special Conditions
*767 SC-2. Drawings:
* * * The work shall conform to the following drawings, dated 16 May 1955, all of which form a part of these specifications * * *.

Letterkemuy, Dam and Reservoir

SECTION 6

Concrete

(For Dam & Appurtenant Work)
* * * * *
6-19. Measurement and Payment :
a. Concrete. Measurement of concrete will be made on the basis of the actual volume of concrete within the pay lines of the structures as indicated on the drawings. % * * Unless otherwise specified, payment for concrete will be made at the respective contract prices per cubic yard in the unit price schedule (dam) for gravity concrete and reinforced concrete which prices shall include the cost of timber drains, all labor, materials, and the use of all equipment and tools required to complete the concrete work; except the cement, reinforcement, rubber water stops, expansion joint filler, and embedded parts which are specified to be paid for separately. No payment will be made for concrete, as such, which is included in lump sum or unit price items in the unit price schedule.
‡ ‡ $
c. Reinforcement. * * * Except as otherwise specified, furnishing and placing reinforcement bars will be paid for at the contract unit price per pound in the unit price schedule (dam) for steel reinforcement. * * *
5. The parties are agreed that the drawing primarily relied upon in this action, sheet 5 of 9, contains no pay lines as referred to in section 6-19 of the contract specifications.
6. The structure to be built at Letterkenny Ordnance Depot included several distinct component parts as shown on *768 Drawing 71-13-01, Sheet 5 of 9. The pertinent parts shown are as follows:
(a) Spillway: The large section of the dam which has a curve at the top landing and a straight plane on the slope on the downstream side. The spillway lies between the spillway training walls.
(b) Spillway Bucket: A curved section at the bottom of the spillway and separated from the spillway by a construction joint at Sta. 0 plus 40.75.
(c) Spillway Training Walls: Concrete walls resting upon the abutment on each side of the spillway running from the peak of the spillway to the expansion joint on the near side of the bucket at Sta. 0 plus 40.75. The spillway training walls are shown in section B-B of Drawing 5 of 9 to be two feet wide and five feet high.
(d) Bucket Training Walls: Concrete walls at the lower end of each of the spillway training walls but resting upon each end of the bucket rather than upon the abutment of the spillway. An expansion joint at Sta. 0 plus 40.75 separates the bucket training walls from the spillway training walls. The bucket training walls terminate at the expansion joint on the opposite side of the bucket shown on the drawing as near Sta. 0 plus 60.75. These walls are shown to be two feet wide and rise to an elevation of 838.0 in section A-A, the specific height of the wall depending upon the curvature of the bucket at a given point.
(e) Wing Walls: Concrete walls located at each end of the bucket on the downstream side. The wing walls are at an angle to the spillway bucket and are shown to be separated from the bucket training walls by an expansion joint. The wing wall is shown in section C-0 of Drawing 5 of 9.
7. The purpose of the spillway is to safeguard the dam by permitting the water to spill over when it rises to the top. The spillway bucket is constructed at the end of the spillway to dissipate the energy which is generated by the water falling over the spillway by deflecting the water upward. The purpose of the spillway training walls is to confine the water between the walls as it flows down the spillway. The bucket training walls confine the water to the bucket as it leaves the spillway proper and also serve to support the earth behind *769 the walls. The wing walls are used to retain the fill behind them, not to guide the flow of water.
8. Drawing Number 71-13-01, Sheet 5 of 9, portrayed several sections of the concrete structure involved as containing reinforcing. Reinforcing is shown in the spillway training walls extending to a depth three feet below the surface of the spillway proper (Section B-B). The bucket training walls are shown to contain reinforcing and that reinforcing extends into the areas of the bucket lying directly beneath the bucket training walls (Section A-A). The drawing shows the concrete of the spillway bucket to contain reinforcing. A small area at the bottom of the spillway proper and adjacent to the spillway bucket between the construction joints at Sta. 0 plus 38.25 and Sta. 0 plus 40.75 is also shown to contain reinforcing. Reinforcing is shown to be around the grout gallery located within the spillway. No reinforcing is shown in the concrete of the wing walls.
Sheet 7 of 9 of the same drawing shows the gate house above elevation 836.0 to include a two-foot-thick concrete wall containing reinforcing.
The reinforcing in the spillway training walls, the bucket training walls, and the gate house was to add stability. The bucket depended upon its weight for stability and the reinforcing was added to protect the concrete from temperature changes. The wing walls have no reinforcing and depend upon weight for stability.
The American Concrete Institute defines reinforced concrete as — ■
Concrete in which reinforcement other than that provided for shrinkage or temperature changes is embedded in such a manner that the two materials act together in resisting forces. (ACI Building Code, ACI 318-56, p. 918)
9. A site inspection was held on May 31, 1955. Plaintiff was represented at that meeting by its estimator, Walter Swift. There is some evidence that the Resident Engineer of the Corps of Engineers was asked at that meeting what concrete would be paid for as reinforced concrete to which he replied orally, “that concrete with reinforcement in it.” There was no written statement to this effect as required by the contract.
*770 10. On June 7,1955, defendant issued to all bidders, including the plaintiff, Addendum No. 1 to the specifications. The Addendum provided, in relevant part, as follows:
(32) Drawing No. 71-13-01, Sheet 5:
* * * * *
(b) On Section “A-A” and Section “B-B”, show training walls as “Reinforced Concrete”..
(c) Add note: “All concrete will be paid for as Gravity Concrete except spillway and bucket training walls and Gate House above Elev. 836.0 which are classed as Reinforced Concrete for payment. [”]
(33) Drawing No. 71-13-01, Sheet 7:
(a) Show concrete below elevation 836.0 on [sic] Gravity Concrete and show above elevation 836.0 as Reinforced Concrete.
2. This addendum shall be attached to the Specifications and form a part thereof. * * *
11. Paragraph (32) (c) of Addendum No. 1 put plaintiff on notice that three parts of the structure would be paid for as reinforced concrete. As described in Finding No. 6, those three parts are (1) the spillway training walls, (2) the bucket training walls, and (3) the gate house above elevation 836.0. The spillway, the bucket, and the wing walls are classed as gravity concrete for payment purposes in Addendum No. 1.
12. In preparing its bid on the Letterkenny project, plaintiff examined the specifications and drawings and made a “take-off” of quantities of each type of material required to perform the work. With respect to the reinforced concrete item, listed as Item A-19 in the Unit Price Schedule, plaintiff’s estimator computed a total of 1,415 cubic yards and the bid was prepared upon that basis. Plaintiff recognized that there was a discrepancy between its estimate and the Government hid schedule but at no time prior to submitting its bid did the plaintiff request an interpretation as to how the 925 cubic yards in question would be paid. Plaintiff, in its estimate of 1,415 cubic yards of reinforced concrete, included the concrete in the spillway bucket.
13. Using the estimate that the project would require 1,415 cubic yards of reinforced concrete, plaintiff estimated the cost of that item. The total labor cost of 1,415 cubic yards *771 of reinforced concrete was then computed to be $12,850, arriving at a unit labor cost of $9.08 per cubic yard. Plaintiff estimated the materials and supplies cost of 1,415 cubic yards of reinforced concrete to be $17,257 with a unit cost of $12.20 per cubic yard. Plaintiff used the unit cost figures of $9.08 and $12.20 per cubic yard to compute the total cost of 490 cubic yards of reinforced concrete and a total labor cost for 490 cubic yards of $4,449 and a total cost of materials and supplies of $5,978. These figures were transferred to a Cost Summary Sheet where a general expense figure of $3,757 and general overhead of 12 percent were added producing a total cost of $15,886 for 490 cubic yards of reinforced concrete. Plaintiff’s bid sheet shows a unit cost of $32.42 per cubic yard for 490 cubic yards with a total cost of $15,886. The same bid sheet shows a unit bid of $75 per cubic yard and a total bid of $36,750 for 490 cubic yards. The figure 1,415 is inserted in red pencil immediately above the figure 490 in the quantity column. Plaintiff’s bid submission contained the following entry:

14. Plaintiff estimated the cost of the reinforced concrete at $32.42 per cubic yard but entered a bid of $75 per cubic yard. No explanation concerning the extraordinary differential in cost and bid on this item is shown although it is clearly inconsistent with plaintiff’s cost-bid ratio on all other items in the contract. The total bid of the plaintiff on the reinforced concrete was $36,750. Plaintiff had estimated its cost for 1,415 cubic yards of reinforced concrete to be $12,850 for labor, $17,257 for materials and supplies, and $3,757 for general expense.[1] Plaintiff’s total cost for 1,415 cubic yards was therefore estimated to be $33,864. It is evident that plaintiff’s bid for reinforced concrete exceeded the estimated *772 costs for the 1,415 cubic yards by $2,886. Plaintiff’s costs for constructing the spillway bucket of reinforced concrete were therefore included in the bid by varying the unit price for the 490 cubic yards rather than raising the quantity to 1,415 cubic yards to more closely approximate the amount of reinforced concrete plaintiff estimated. When including the area of the spillway bucket in the bid on the reinforced concrete by raising the unit price to $75 per cubic yard, plaintiff failed to subtract this area from the estimated amount of gravity concrete shown on the bid form. Consequently, plaintiff was paid $16.25 per cubic yard for that area even though the entire cost of it had been included in the bid on the reinforced concrete.
15. Plaintiff’s bid was submitted to the Government on June 17, 1955, and bids were opened the same date. Plaintiff was the low bidder on Schedule A of the project but not on Schedules B and C. While plaintiff was lowest on the total bid for Schedule A, it was not the low bidder on Item A-19, Eeinforced Concrete, on that schedule.
16. On June 18, 1955, plaintiff’s estimator, Mr. Fisk, recomputed the amount of reinforced concrete in the project. This computation totaled 573 cubic yards of reinforced concrete and did not include any concrete for the spillway bucket.
17. Prior to signing the contract, plaintiff requested a conference with the District Engineer for the Corps of Engineers. This conference was held in the Baltimore District office of the Corps of Engineers on June 21,1955. Both plaintiff and defendant were adequately represented at the meeting.
The question of payment for the concrete in the spillway bucket was raised at the conference. Addendum No. 1 was discussed. Plaintiff was advised by the contracting officer, Col. Stephen Smith, that it was his decision that the contractor would be paid for reinforced concrete for the spillway retaining walls, the bucket retaining walls, and the gate house above a certain elevation. Plaintiff expressed his disagreement with that interpretation.
Legal counsel for the Corps of Engineers, Baltimore District, C. F. Bihy, explained, in the presence of plaintiff’s representatives, the administrative procedures by which the bid *773 der could obtain relief if a bona fide error had been made in the bid. It was explained that plaintiff would have to furnish a breakdown of its bid figures in order to determine the validity of any mistake claimed. Plaintiff was apparently concerned over the length of time it would take to process a claim of mistake in bid and informed the District Engineer it would not protest the award, but would accept the contract as bid. After the conference on June 21, 1955, plaintiff was undecided as to whether or not the contract should be signed, but, on June 24, 1955, the contract was executed as written.
18. On July 2, 1955, plaintiff’s estimator computed the amount of mass or gravity concrete in the project. Including the spillway bucket at 733 cubic yards, the estimate showed a total of 19,753 cubic yards of gravity concrete.
19. On July 6, 1955, plaintiff recomputed its bid estimate using the revised estimate of 573 cubic yards of reinforced concrete. Plaintiff computed the labor cost and the materials and supplies cost for 573 cubic yards, divided each figure by 573 to determine the cost per cubic yard, multiplied the two unit cost figures by 490 cubic yards, then added these two figures plus $8,230 for general expense and 12 percent for general overhead. The total estimated cost arrived at in the recomputed bid for 490 cubic yards of reinforced concrete was $30,342.
Dividing the revised total cost by 490, plaintiff computed a revised unit cost of $61.92 per cubic yard for reinforced concrete. On the revised bid sheet plaintiff again showed a bid price of $75 per cubic yard and a total 'bid of $36,750 for reinforced concrete. After transferring the spillway bucket to gravity concrete which would have had the effect of raising the unit cost of reinforced concrete from $32.42 per cubic yard to $61.92 per cubic yard plaintiff was still under its actual bid figure of $75 per cubic yard in both estimate.
20. During performance of the job, plaintiff entered the actual and estimated quantities of reinforced concrete on a Job Cost Ledger Card. This card shows an estimated quantity of 560 cubic yards of reinforced concrete which represented the amount of reinforced concrete the Government had recognized or would recognize. Entries made at various *774 dates during performance of the contract from April 8,1956, to April 14, 1957, indicate a final figure of 520 cubic yards of actual reinforced concrete.
21. In a letter dated March 18,1957, to the Resident Engineer of the Corps of Engineers, plaintiff expressed the view that an error in the classification of concrete had been made. Plaintiff stated that the concrete in the bucket had been misclassified as gravity concrete when, in fact, it was reinforced concrete and should be so classified.
In a response dated March 20,1957, the Corps of Engineers referred plaintiff to the applicable sections of Addendum No. 1, and further stated:
* * * [T]his office is of the opinion that the only reinforced concrete that can be paid for under the provisions of your contract is the concrete hi the training walls, the gate house above a certain elevation, and the gate house super structure.
In reviewing the above data, it has been noted that in the quantities you furnished for partial payment estimates, the wing walls were included as reinforced concrete. The inclusion is in error and your next Partial Payment Estimate will reflect a reduction from the reinforced concrete item for the wing walls and an addition to the gravity concrete item.
To be specific in answering your letter, the bucket sections of the Dam camiot be interpreted by this office as reinforced concrete under the contract drawings or specifications; therefore, concrete placed in the bucket section will not be reclassified on your next Partial Payment Estimate.
Plaintiff again wrote the Corps of Engineers on March 21, 1957, stating that it interpreted the specifications to include the following areas to be paid as reinforced concrete:
(1) All concrete in the gate house structure above elevation 836.0
121 Spillway bucket
(3) Training walls for entire depth of reinforcing.
22. On July 12,1957, the contracting officer, after consideration of plaintiff’s letters of March 18 and March 21, denied plaintiff’s claims, making the following findings:
a. All concrete in the gate house structure, including southeast wall, above elevation 836.0 is classified as Re *775 inforced Concrete. (This determination is in agreement with your assertion and has never been in dispute.)
b. All concrete in the spillway bucket is classified as Gravity Concrete. The note on Contract Drawing No. 71-13-01, Sheet 5 of 9, added by Addendum No. 1, Item (32) (c), states that all concrete will be paid for as Gravity Concrete except (1) gate house elevation above elevation 836.0, and (2) training walls for spillway and bucket, which exceptions are classified as Eeinforced Concrete for payment. Therefore the spillway bucket is established as Gravity Concrete for payment purposes.
c. All concrete in the training walls is classified as Reinforced Concrete in accordance with note on Contract Drawing No. 71-13-01, Sheet 5 of 9 as added by Addendum No. 1, Item (32). It is my determination that training walls mean that concrete which projects beyond the face of the spillway and bucket structures and not any of the concrete which is within and part of the respective structures.
d. The descriptive changes to revised Contract Drawing No. 71-13-01, Sheets 5 and 7 of 9 are wholly consistent with Addendum No. 1, Items (32) and (33). You received these revised contract drawings on 28 July 1955 which incorporated the descriptive changes. Under Article 3 of the contract you were required to submit any claim for an alleged “change” within thirty (30) days.
By letter dated August 5, 1957, plaintiff filed an appeal with respect to the contracting officer’s decision of July 12, 1957, to the Chief of Engineers.
23. Under Docket No. 1378, the Corps of Engineers Claims and Appeals Board held hearings on plaintiff’s appeal on January 15,16, and 30,1958. During the hearing plaintiff’s counsel stated that the items in dispute were “the training walls and the spillway bucket.” A member of the Board, Colonel Hall, pursuant to agreement of the parties, crosshatched the areas in dispute before the Board on Defendant’s Exhibit 4, Drawing No. 71-13-01, Sheet 5 of 9. That drawing shows crosshatching in the spillway bucket as defined in Finding 6(b), in the two-foot-wide, three-foot-deep area directly below the spillway training walls (Section B-B), and in an area of the bucket two feet wide directly beneath the bucket training walls (Section A-A). No crosshatching is shown in the wing walls (Section C-C).
24. On April 23,1958, the Corps of Engineers Claims and *776 Appeals Board rendered its decision denying plaintiff’s appeal. The Board ruled that the plaintiff was aware of the Government’s interpretation of the contract prior to accepting the contract and could not later claim that there was an ambiguity in the contract which should be resolved in its favor.
25. Plaintiff duly appealed the decision of the Claims and Appeals Board to the Secretary of the Army. Under Docket No. 4998, the Armed Services Board of Contract Appeals held a hearing on the appeal on October 7,1958.
26. On February 12, 1959, the Armed Services Board of Contract Appeals, acknowledging that “The problem presented * * * is the determination of the true meaning of the contract * * rendered its decision denying plaintiff’s appeal with regard to the spillway bucket and sustaining the appeal with regard to the training walls.
The complaint before the Board alleged the area in dispute to be 880.3 cubic yards of concrete in the spillway bucket and 120.8 cubic yards of concrete in the training walls making a total claim of $55,877.13.
After reviewing the testimony and the specifications, the Board held that plaintiff’s interpretation of the contract, particularly Addendum No. 1, to include the spillway bucket as reinforced concrete for payment purposes was so strained and unnatural as to be unreasonable.
The Board also held that the contractor was aware of the ambiguity at the time it entered the contract so the ambiguity would not be decided against the defendant merely because the defendant had drafted the specifications.
With regard to the training wall, the Board held that there was no construction joint shown on Drawing 71-18-01, Sheet 5 of 9, at the surface of the spillway proper, and that—
* * * Under the original drawing * * * it would have been permissible to exclude the three-foot reinforced concrete subsurface area from the monolith and to have constructed the training wall as a single member of reinforced concrete extending from five feet above the surface level to three feet below the surface.
The Board held that the method of constructing the training walls would not affect the interpretation of what constituted the training walls in the contract drawings.
*777 27. Plaintiff filed' a motion for reconsideration of the Armed Services Board of Contract Appeals decision in ASBCA No. 4998. After a bearing, the motion for reconsideration was denied by the ASBCA in an opinion dated May 20,1959.
28. On July 28,1959, plaintiff sent the Corps of Engineers an invoice in the amount of $7,097 for 120.8 cubic yards of reinforced concrete in the training walls at $58.75 per cubic yard which was alleged to be in accordance with the Armed Services Board of Contract Appeals decision in ASBCA 4998. Following a conversation with the Corps of Engineers regarding the quantity of the claim, plaintiff wrote defendant on September 15,1959, that the decision itself stated the amount to be 120.8 cubic yards and that no portion of the training walls above the face of the dam had been included.
The Corps of Engineers, on October 12, 1959, forwarded Payment Estimate No. 20 to the plaintiff reflecting a transfer of some 41.3 cubic yards of concrete from gravity to reinforced.
Plaintiff’s counsel returned the estimate on October 23, 1959, stating plaintiff was entitled to payment for 120.8 cubic yards under the Board decision.
On November 2, .1959, plaintiff prepared a computation which totaled 120.8 cubic yards of concrete in the training walls and wing walls which it alleged was included in the Board decision. This computation included the wing walls, the alleged subsurface area of the spillway training walls, the bucket training walls, and 45 cubic yards in Section F-F of Sheet 6. The nature and content of Section F-F is unknown since Sheet 6 was neither referred to nor placed in evidence.
The Corps of Engineers notified plaintiff on November 3, 1959, that the quantity of concrete in the alleged subsurface areas of the training .walls was being investigated and further requested a copy of plaintiff’s computation. Plaintiff’s counsel, in a letter dated November 4, 1959, declined to furnish the computation to the defendant or to enter into any further negotiations on the matter.
The Corps of Engineers diagrammed its computation of the areas said to be in dispute and reached a total figure of *778 89.9 cubic yards in the alleged subsurface spillway training walls and subsurface bucket training walls. Relying on that computation, defendant, on November 16,1959, sent plaintiff a letter and Revised Payment Estimate No. 20 showing the reclassification of 39.9 cubic yards of concrete from gravity to reinforced.
Plaintiff’s counsel rejected the Corps of Engineers’ computation on November 19, 1959, and requested the contracting officer to make findings in order that the matter could be removed to the Board for consideration. The contracting officer issued his Findings of Fact on December 4, 1959, and found that the disputed area consisted of only 39.9 cubic yards of concrete and that it was physically impossible for 120.8 cubic yards to be in the area. Accordingly, plaintiff’s claim for payment for 120.8 cubic yards was denied.
Plaintiff appealed the decision of the contracting officer to the Secretary of the Army on December 17, 1959. On December 18, 1959, plaintiff sent the appeal to the District Engineer who forwarded it to the Chief of Engineers.. The Chief of Engineers transmitted the appeal notice to the Armed Services Board of Contract Appeals on January 15, 1960, without any action by the Corps of Engineers Claims and Appeals Board.
29. The last mentioned appeal was given docket No. 6210 and hearings were held by the Armed Services Board of Contract Appeals on July 7, 1960. In a decision issued September -26, 1960, the Board, interpreting its previous decision, held that the issue of quantum had not been litigated in ASBCA 4998 even though a definite amount in controversy had been alleged and testimony had been offered as to the amount. The Board held that the issue as to amount could not be raised for the first time before the Armed Services Board of Contract Appeals.
In ASBCA 6210 the Board made no determination as to the correct amount of concrete to be reclassified as reinforced, but held only that plaintiff was not entitled to recover for 120.8 cubic yards merely because that was the amount alleged to be in the disputed area in ASBCA 4998. The appeal as to quantity was dismissed as premature since there had been no decision on the issue by the Corps of Engineers Claims *779 and Appeals Board prior to tlie Board bearing in ASBCA 6210.
30. The petition in this case was filed with the Court of Claims on December 10, 1959, just prior to the filing of the appeal in ASBCA 6210. Defendant’s answer was filed on April 11,1960, prior to the decision in ASBCA 6210.
31. Following the decision in ASBCA 6210, the defendant wrote the plaintiff on November 10, 1960, calling attention to the Government’s obligation to file a counterclaim under then Buie 17(a) (now Buie 21(a)) on matters arising out of the same transaction. Defendant stated it would be unable to determine whether a counterclaim should be filed until plaintiff had completed its administrative procedure. ,
32. On October 27, I960, the ASBCA appeal assembly with respect to plaintiff’s subsurface training wall claim was forwarded to the North Atlantic Division of the Corps of Engineers in New York City, where the Division Engineer was authorized to decide such appeals as a representative of the Chief of Engineers.
33. A hearing was held in the office of the Division Engineer on January 9,1961, to determine the amount of concrete for which payment was due under ASBCA 6210. The Division Engineer issued his finding on January 17, 1961. The decision reads in part as follows:
2. Based on a review of the record and the contractor’s, presentation at a hearing in this office on 9 January 1961, I find that 79.9 cubic yards of reinforced concrete constitutes an equitable adjustment in accordance with ASBCA Decision No. 6210. This is predicated on the Board’s finding that wing walls are part of the training walls. The additional 40 cubic yards, over the 39.9 cubic yards heretofore allowed by the Contracting Officer, is a compromise of the actual quantity of 80 cubic-yards contained hi the wing walls. The contractor has agreed to accept a total of 79.9 cubic yards in full settlement of his claim relative to the training walls. Accordingly, Payment Estimate No. 20 should be revised: to include an additional 40 cubic yards of reinforced, concrete.
In its decision (ASBCA 6210), the Board stated in partr
The Board held in effect that appellant [in ASBCA. 4998] was entitled to be paid at the reinforced concrete- *780 rate for subsurface portions of the spillway training walls and the bucket training walls depicted in the contract drawings as two feet wide and extended for three feet below the face of the dam. The volume of these portions of the training walls can be computed from the contract drawings with great accuracy by a competent engineer, and obviously the difference between 120.8 cubic yards and 39.9 cubic yards cannot be accounted for as normal variance in mathematical calculations.
34. Pursuant to the decision of the Division Engineer, plaintiff obtained payment for 79.9 cubic yards at the rate of $58.75 per cubic yard (the difference between the reinforced rate of $75 per cubic yard to be paid and the gravity rate of $16.25 per cubic yard which had been paid).
CONCLtrSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on its claim; that defendant is not entitled to recover on its counterclaim; and, therefore, the petition and the counterclaim are dismissed.

 In addition to tbe above-mentioned provision of tbe instructions to bidders, tbe contract in tbe present suit contained a clause libe that relied upon in Beacon Constr. Co. v. United States, supra.

Defendant does assert that, despite the introduction (by both parties) of de novo evidence, judicial review should have been limited to the administrative record. Defendant relies upon United States v. Carlo Blanchi & Co., 373 U.S. 709 (1963). We must reject defendant’s contention for the doctrine of waiver is applicable. Cf. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 807, 337 F. 2d 861 (1963) ; WPC Enterprises, Inc. v. United States, supra, 163 Ct. Cl. at 8.

 With regard to the power of a contracting officer to enter into settlements, plaintiff cites Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 103, 319 F. 2d 173 (1963). See also Brook & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F. 2d 951 (1965).

 Also distinguishable on grounds similar to that mentioned above are International Harvester Co. v. United States, 169 Ct. Cl. 821, 839, 342 F. 2d 432 (1965), and C. J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1965). In the latter case, the court emphasized that it was dealing with administrative decisions under the disputes clause, not with compromises or settlements. 169 Ct. Cl. at 479, footnote 10.

 The last item is the same as for 490 cubic yards since it is only an allocation of part of the general expense estimate on the entire contract and the remainder of that cost had been added to other items in the contract.