URBAN PLUMBING & HEATING CO.,
an Oregon Corporation

v.

The UNITED STATES.

No. 70-67.

United States Court of Claims.

March 14, 1969.

Warde H. Erwin, Portland, Ore., attorney of record for plaintiff.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

The plaintiff, Urban Plumbing & Heating Company, is an Oregon Corporation. It entered into a contract with the Department of Defense, Alaska Air Command, of the United States on June 23, 1961, in which it agreed to make certain modifications in the central heating and power plant at Eielson Air Force Base, Alaska, for the sum of $487,775.[1] The contract required the work to be completed within 120 days after June 30, 1961, the day that notice to proceed was given. Performance was to commence about July 1, 1961, and the project was to be completed by October 28, 1961, well in advance of the usual beginning of severe winter weather in Alaska. In fact, the expected winter weather made it necessary for the project to be completed by October 28, 1961, because much of the work had to be done inside the central heating and power plant, and, while the work was going on, the plant had to be shut down. Since the plant supplied the heat and power for the air base, it could not be shut down during the severe Alaskan winter season. Under these circumstances, time was of the essence, because after the winter weather set in, it would be impossible for the plaintiff to work effectively on the project, either inside or outside of the plant.

The contract required the plaintiff to submit to the architect-engineer (hereinafter called AE) of defendant for approval or rejection the products it proposed to use in the project. The contract specified certain named brands, "or equal," of the items to be supplied by the contractor. The contractor was given the right to submit materials and equipment it proposed to use other than the named brands, but which it considered equal to those named. Of course, this arrangement required the defendant to promptly name or appoint an AE,

1. Contract No. AF 65(503)–1505.

otherwise the contractor would not have anyone to whom it could submit its products for approval.

The defendant delayed the appointment of the AE for a period of time. The defendant says the delay in the appointment was 18 days, but plaintiff contends it was 38 days and that it did not have notice of the appointment for 4 more days. We do not have to resolve this time dispute between the parties. However, we do take note of the fact that there was a substantial delay by defendant in appointing the AE. In our opinion, this delay materially affected the progress of the work, but as will be seen below, it was not the only delay on the part of the defendant that the contractor encountered.

After the AE was appointed, the contractor submitted to him for approval samples of the products it proposed to use, as required by the contract. The contractor says these products were equal to or better than the named brands set forth in the contract. The AE delayed approval or rejection of the submitted items. In the meantime, plaintiff had tentative arrangements with suppliers of the products to furnish the items for the project, but the suppliers would not manufacture them until they were approved. Time was passing and both parties were getting nervous about the progress of the project. After a substantial delay, the AE rejected the products submitted by plaintiff as not meeting the specifications of the contract. There is a dispute between the parties as to how long the AE delayed making his decision, but it appears to be undisputed that he did wait an unreasonable length of time to make a decision and that this delayed the contractor in the performance of the work. The contractor was required to order the named brands of items listed in the contract after the AE rejected others submitted by it, and this required more time.

On August 30, 1961, the contracting officer notified plaintiff in writing that the Government considered plaintiff's progress a condition that was endangering the performance of the contract, and that unless the condition was cured within 10 days, the Government "may terminate subject contract for default." The plaintiff answered by its letter of September 7, 1961, in which it excepted to the Government's notice and pointed out the delays that had been caused by the Government. It asked for a time extension of 90 days because of these delays. The contracting officer answered this request in writing by letter of September 26, 1961, in which he admitted "since some time delay was caused by disapproval of material an extension of 30 days is considered fair and reasonable to cover the delay involved."

The contractor rejected the offer of a 30-day extension by its letter of October 18, 1961. It again detailed the delays caused by the Government and requested a time extension of 120 days.

The contracting officer answered this request in writing on November 13, 1961, in which he said, among other things:

> However, since the time required by the Government to approve or disapprove data submitted was over 30 days and in part is beyond the control of the contractor, a reasonable time extension is considered in order. In accordance with General Provision Clause 5(c) a time extension of 69 days (58 + 11) is considered the time delay which was beyond the control of the contractor.

As an alternative, the contracting officer offered an amendment to the contract which would give the contractor a 245 day extension (to June 30, 1962) provided it followed the work schedule prescribed by the Government and agreed to the following clause in the amendment:

> This supplemental agreement neither increases or [sic] decreases contract costs.

This extension would give the contractor 120 days after the winter was over to finish the project. This was equal to the total original time of 120 days.

A representative of the contractor met with the contracting officer on Novem-

ber 16, 1961, and at that meeting the contractor was given its choice of accepting the 69 day time extension, or signing the supplemental agreement mentioned above with a 245 day extension, or having the contract terminated for default. The contractor was required to make its choice within two days. It decided to sign the supplemental agreement provided that the word "costs" in the sentence quoted above be changed to "price." This was agreed to and the change was made. This agreement also contained the following statement:

The above extension of time is granted due to adverse weather conditions and Government delay in approval of data.

The contractor finished the work within the 245 day time extension granted in the supplemental agreement. However, its costs in doing so were $79,905.22 more than the original contract price. An audit by the Air Force confirmed the correctness of this figure. The contractor presented his claim of $79,905.22 in extra costs, plus overhead of 15 percent of the total contract cost of $567,680.22 amounting to $85,152.03, plus profit of 10 percent on the total cost and overhead ($652,832.25) amounting to $65,283.25, plus cost of its bond (01 percent of $718,-115.47) in the sum of $7,181.15, plus taxes in the sum of $1,795.38, making its total claim $239,316.98 (the difference between the original contract price of $487,775 and the final costs, plus overhead, profit, cost of bond and taxes as set forth above in the total sum of $727,-091.98).

The contracting officer rejected plaintiff's claim and it appealed to the Armed Services Board of Contract Appeals (hereinafter called the Board), which also refused plaintiff's claim in its entirety in an opinion dated December 30, 1966, 66–2 BCA ¶6062. Its motion for reconsideration was denied by the Board on February 8, 1967.[2] The plaintiff filed suit in this court on March 13, 1967, and asserts the same claim that he made to the contracting officer and to the Board. The defendant filed an answer contesting plaintiff's claim. Both parties have filed motions for summary judgment which we will now consider.

■ The contract involved here contained the standard Suspension of Work clause. Therefore, plaintiff's delay claim is redressable at the administrative level. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L. Ed.2d 662 (1966). The plaintiff has exhausted his administrative remedies, except for the amount of his damages, and the case is now before us for review. The defendant insists that since this case falls within the purview of the Wunderlich Act, we are bound by the decision of the Board. It contends that the decision of the Board is supported by substantial evidence, is neither arbitrary, capricious, nor grossly erroneous, and that its determinations of questions of law are correct. The plaintiff, on the other hand, takes the opposite position on all of these points. It especially urges that the decision of the Board on questions of law is erroneous.

Both plaintiff and defendant have devoted most of their briefs to the question of whether or not there was an accord and satisfaction of all claims of the parties, past, present, and future, by their signing the supplemental agreement on November 16, 1961, wherein the plaintiff was given a time extension of 245 days to complete the contract and wherein it was stated that "This Supplemental Agreement neither increases or [sic] decreases contract price." The plaintiff says that the word "costs" was changed to "price" at its request and that it understood the meaning of the provision as changed to be that it would be entitled to collect additional costs if any were sustained by reason of the time extension. Consequently, plaintiff says there was no accord and satisfaction of anything.

2. ASBCA No. 9831, appeal of Urban Plumbing & Heating Company, under Contract No. AF 65(503)–1505.

The defendant says that plaintiff was in default at the time the amendment was signed and it did not have to grant the time extension but could have defaulted the plaintiff; that the giving of the time extension was consideration for, and an accord and satisfaction of, all of plaintiff's claims, and that this was the plain meaning of the word "price" in the amendment. The Board agreed with the defendant.

It is our opinion that it is not necessary to reach the accord and satisfaction question in disposing of this case.

We start with the threshold question of whether or not the Government delayed the contractor, and, if so, how much and what were the consequences of such delay. The first part of this question is easily answered, because it is undisputed that the Government did delay the contractor. The contracting officer admitted this delay in his letters of September 26 and November 13, 1961, mentioned above. The amendment (Supplemental Agreement) signed by the parties on November 16, 1961, acknowledged such delay on the part of the Government when it provided that the time extension was granted "due to adverse weather conditions and Government delay in approval of data." Also, the Board found that the Government delayed the contractor. It stated in its opinion, "The respondent did unreasonably delay acting upon these submittals. * * * there is no reasonable excuse for delaying official ac-

tion on the Durabilt submittal until 29 August * * *." Again, the Board said: "The parties were jointly responsible for the delay in delivery of the equipment, the appellant because it offered equipment which did not meet the contractual requirements, and the respondent because it delayed too long in rejecting it." We conclude that the Government did delay the contractor.[3]

How much delay was caused by the Government is more difficult to determine, but it seems clear that it was at least 69 days. In the contracting officer's letter of November 13, 1961, to the contractor, he said that the records of his office showed, "31 days government delay on disapproval of Richardson Scales & Combustion Coils" and "58 days government delay on disapproval of Durabilt Equipment." In the same letter he said " * * * a time extension of 69 days (58+11) is considered the time delay which was beyond the control of the contractor." The Board, in commenting on the 69 days offered by the contracting officer as a time extension said, "This was apparently computed as the total lapsed time between the notice to proceed and appellant's receipt of the rejection of the Durabilt ash removal equipment." The Board went on to say: "The contracting officer offered 69 days time extension *because of the delay in approvals.* * * * we cannot find that it was not as much as was due for excusable cause." We regard this as a finding by the Board that the Govern-

3. There is no showing that plaintiff was responsible for any substantial part of the delay. As indicated in the quotation from its opinion set forth immediately above in the text, the Board erroneously assumed that the plaintiff was responsible for part of the delay "because it offered equipment which did not meet the contractual requirements." This statement fails to take account of the contractor's express right under the contract to propose for approval other materials and equipment which it considered equal to the brands specified. These "or equal" provisions did not mean that the proposed substitutes had to comply with every detail of the specifications (which were based on particular brands, without nam-

ing them). The "or equal" clauses were designed to establish a "standard of equality" and meant only that the proffered "deviation," had to function as well as the specified equipment. See Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965). The Board found that the plaintiff's proposals did not meet every single detail of the specifications, but the Board never found, and there is no proof, that these proposals failed to meet the "or equal" standard in the broader sense in which it should have been construed. On the record, therefore, the plaintiff cannot be held responsible for offering "equipment which did not meet the contractual requirements."

ment did delay the contractor 69 days. If it could be said that the Board did not so find, then we conclude that the evidence on the matter was such that as a matter of law the Board could have made only one finding of fact with respect to it. Under these circumstances, we are authorized to make the finding on the question. Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967). Accordingly, we find that the contractor was delayed 69 days by the Government.

We now consider what effect this 69 day delay had on the performance of the contract by the contractor. We agree with the contractor that under the conditions existing in Alaska, there is a vast difference between 69 days in the summer and fall when working conditions are favorable and 69 days in the wintertime when little, if any, work can be done. This was particularly true in this case, because the facts show that most of the work had to be done inside the heating and power plant. This plant had to be shut down in order for the plaintiff to work in it. The Government could not allow it to be shut down in winter, because it supplied heat and power for the air base. If the plaintiff worked at all inside the plant while it was in operation, there was danger of an explosion of the combustible coal dust found inside. For all these reasons, the plaintiff could not work inside of the plant during the winter months. It could not work outside the plant in the winter because of the extreme cold, snow, and ice existing in that area. The record shows that the winter of 1961–62 was a severe one in Alaska, with temperatures below zero much of the time. By the time the amendment to the contract was signed on November 16, 1961, the temperature had been as low as 20 degrees below zero and bitter cold prevailed most of the time.

The parties intended that the project be completed by October 28, 1961, before the onset of the Alaskan winter. The plaintiff did not contract to work under conditions which exist during the winter in Alaska. The Government delayed the work of the contractor 69 days, which prevented its completion of the project before winter. In other words, the delay caused by the Government would have required the contractor to have worked during the winter months even if a time extension of 69 days had been given and accepted, but, as has already been pointed out, work during the winter season was impossible. Even the Board said: "The 69 days would have been useless  *  *." It is obvious that the Government realized the situation when it asked the contractor to accept a 245 day time extension, which would extend the time of performance through the winter and allow it 120 days thereafter to finish the project.

It is clear that at the time the Government made the three alternative propositions to the plaintiff on November 16, 1961, it had delayed the plaintiff until the date for the completion of the contract (October 28, 1961) had passed, through no fault of the contractor. The offer of a 69 day extension at that time meant nothing whatsoever, because even if it had been granted and accepted, the Government would not have allowed the contractor to work inside the heating and power plant for the reasons pointed out above. Neither could the contractor have worked outside the plant because of the winter weather. Therefore, the offer of a 69 day extension at that time of year was an empty gesture and amounted to nothing as far as the contractor was concerned.

All that was left of the alternatives was the demand of the Government that the contractor accept the 245 day extension of time upon the terms and conditions stated in the supplemental agreement, upon the threat of the Government that if the contractor did not so accept it, the contract would be terminated for default. The contractor was given only two days to make a choice. The contractor says this demand and threat amounted to coercion and duress under the circumstances, and that by

reason thereof, it was forced to sign the amendment and accept the 245 day time extension. We agree with the contractor.

■ While it is true that at the time the amendment was signed on November 16, 1961, the time for the completion of the contract (October 28, 1961) had passed, and because of this fact, the contractor was technically in default. Schlesinger v. United States, 390 F.2d 702, 706–707, 182 Ct.Cl. 571, 580–581 (1968). But it was a default that was excusable and due to circumstances beyond its control. In fact, it was a default caused by the Government itself. Under these circumstances, it was not such a default as would authorize a true termination for default by the Government in the sense that the contractor would be denied any recovery. It would be unreasonable, indeed, to allow the Government to terminate the contract for default when the default was caused by the Government's own acts, unless the termination is deemed to be for the convenience of the Government as is authorized by paragraph 5(d) of the contract.[4] In case of such a termination, the contractor is entitled to an equitable adjustment in accordance with the Termination for Convenience clause of the contract (paragraph 31). See Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 95, 167 Ct.Cl. 604, 613 (1964); Bailey Specialized Buildings, Inc. v. United States, Ct.Cl. 404 F.2d 355, decided December 13, 1968.

The contract, itself, prohibits termination for default by the Government under the circumstances of this case, except for the convenience of the Government. Paragraph 5 of the contract provides:

5. TERMINATION FOR DEFAULT —DAMAGES FOR DELAY—TIME EXTENSIONS

\*   \*   \*   \*   \*   \*

(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, \* \* \*, *acts of the Government, in either its sovereign or contractual capacity,* \* \* \*, and unusually severe weather, \* \* \*. [Emphasis supplied.]

The technical default of the contractor aforesaid was not one that required the Government to terminate the contract. Schlesinger v. United States, *supra,* 182 Ct.Cl. at 581, 390 F.2d 702. Paragraph 5(a) of the contract says that in case of default by the contractor, the Government *may* terminate the contract, but there is nothing that requires it to do so. In fact, subdivision (b) of the same paragraph describes what shall be done if the Government does *not* terminate the contract for default of the contractor.[5]

---

4. Clause 5, Termination for Default-Damages for Delay—Time Extensions, is amended to add the following paragraphs (d) \* \* \*:

"(d) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract was due to causes beyond the control and without the fault or negligence of the Contractor pursuant to paragraph (c) of this clause, such notice of termination shall be deemed to have been issued pursuant to the Termination for Convenience of the Government clause of this contract, and the rights and obligations of the parties hereto shall in such event be governed by such clause."

5. 5. TERMINATION FOR DEFAULT —DAMAGES FOR DELAY—TIME EXTENSIONS

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Gov-

■ ■ The Board decided that the contractor was in default and that in threatening to terminate the contract for default, the contracting officer was threatening to do only what he had a right to do. We agree in part and disagree in part with this decision. These are questions of law and we are not bound by the decision of the Board with respect to them. T. C. Bateson Constr. Co. v. United States, 319 F.2d 135, 160, 162 Ct.Cl. 145, 187 (1963). We agree that the Board correctly decided that the contractor was in default on November 16, 1961, because the completion date of the contract (October 28, 1961) had passed, but this was only a technical default for which the contractor was not responsible and which was in fact caused by the Government. We do not agree that in threatening to terminate the contract for default, the contracting officer was doing only what he had a right to do. In making this threat, the contracting officer undoubtedly meant, and the plaintiff undoubtedly understood, that the termination would be a true default termination in which the plaintiff would receive nothing, not one that would be converted into a termination for convenience. We hold that under the circumstances of this case, the contracting officer had no right to terminate the contract, except for the convenience of the Government, and when he threatened to do so to force the plaintiff to sign the supplemental agreement, he was guilty of coercion and duress against the contractor. Whether or not duress exists in a particular case, depends on the facts in the case. We said in the case of Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62, (1953):

The law of duress has broadened somewhat during recent years making it virtually impossible to arrive at any clear-cut definition, and the courts have stated that its application must of necessity depend upon the circumstances of each individual case. Morrill v. Amoskeag Sav. Bank, 90 N.H. 358, 9 A.2d 519, 524. An examination of the cases, however, makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. United States v. Bethlehem Steel Corp., 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855; French v. Schoemaker, 14 Wall. (U.S.) 314, 332, 20 L.Ed. 852. In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. * * *

---

ernment for any excess cost occasioned the Government thereby, and for liquidated damages for delay, as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. If the Contractor's right to proceed is so terminated, the Goverment may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.

(b) If the Government does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the work, in which event he and his sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.

We think the three elements common to the duress cases quoted above are present in the instant case.

The Board found that no duress existed, citing Du Puy v. United States, 67 Ct.Cl. 348, 381 (1929) for the proposition that in order to constitute duress there must be something present other than threatened financial disaster. While it is true that the court in that case indicated by dicta that the fact that a contractor is in a bad financial condition for which the Government is in no way responsible, at the time an agreement is signed, is not enough to constitute duress, this is not the situation here. The Board cites Commonwealth Engineering Co. of Ohio v. United States, 180 F.Supp. 396, 148 Ct.Cl. 330 (1960), cert. denied, 364 U.S. 820, 81 S.Ct. 55, 5 L.Ed.2d 50, in support of its holding "where the contracting officer threatens default termination, and the contractor is actually in default, the contracting officer was threatening to do only what he had a right to do. This is not duress." It is at once apparent that this is not the situation here. The cases cited by the Board are clearly distinguishable from our case and are not controlling. We are not bound by this decision of the Board on questions of law.

On the question of duress, the instant case is governed by the principles announced in the decisions in Aircraft Associates & Mfg. Co. v. United States, 357 F.2d 373, 174 Ct.Cl. 886 (1966); James Shewan & Sons, Inc. v. United States, 73 Ct.Cl. 49 (1931); Universal Sportswear, Inc. v. United States, 180 F.Supp. 391, 145 Ct.Cl. 209 (1959); Struck Constr. Co. v. United States, 96 Ct.Cl. 186 (1942), and similar cases.

In Aircraft Associates & Mfg. Co. v. United States, *supra*, the plaintiff bid on the purchase of a number of discarded airplanes from the Government for the purpose of salvaging aluminum from them. After plaintiff made its bid and before the planes were delivered to it as the successful bidder, the Government removed large quantities of aluminum parts from the planes. When the plaintiff learned of this and complained, the contracting officer refused to allow the plaintiff to continue with the contract, locked the gates to the air base to keep plaintiff's workmen out, and threatened to terminate the contract for default unless plaintiff signed an agreement releasing his claims for the missing parts. At that point, the plaintiff was behind in its payments to the Government, because the Government had denied it access to the planes, so that it was unable to sell the parts it had salvaged, and, accordingly, it was in technical default through no fault of its own. In this situation, the plaintiff signed the release, finished the contract, and then sued the Government for the value of the missing parts, contending that it signed the release because of duress and coercion by the Government. We held that the facts showed that the contracting officer was guilty of duress and coercion, and we entered judgment for the plaintiff saying:

> When all of the facts recited above are coupled with the exclusion of plaintiff and its workmen from the base and the deprivation of the only opportunity plaintiff had to repay its obligation to the Government, we conclude that the release was obtained by the kind of duress which renders the release invalid and not binding upon the plaintiff. James Shewan & Sons v. United States, 73 Ct.Cl. 49 (1931) and Struck Construction Company v. United States, 96 Ct.Cl. 186 (1942).

As the court stated in the *Shewan* case at page 93:

> In cases of this kind the defendant should not be permitted to take advantage of its own failure to perform a solemn contract obligation in order to exact from the other parties to the contract a surrender of rights which he would not otherwise be compelled to give up.

In that decision the court pointed out that settlements and payments exacted by officials of the Government without lawful authority and in arbitrary

fashion to which parties have yielded to escape financial disaster have been set aside on numerous occasions by the Supreme Court. Thus, in Robertson v. Frank Brothers Co., 132 U.S. 17, 23, 10 S.Ct. 5, 33 L.Ed. 236 (1889), the Supreme Court stated:

> When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required, as where an officer exacts illegal fees, or a common carrier excessive charges. But the principle is applicable in all cases according to the nature and exigency of each. *Id.* 174 Ct.Cl. at 898, 357 F.2d at 380.

The contractor was awarded a contract by the Government in the case of James Shewan & Sons, Inc. v. United States, *supra,* to repair and dry-dock ships belonging to the Government. The contract specified that the contractor would be paid monthly, but the Government did not make the payments on time and many of them were long overdue. The Government suddenly terminated the contract while the work was in progress. A year and seven months later, the Government offered to pay the contractor $850,427.10 on the long overdue bills, on condition that the contractor sign a full release of all other claims. The contractor protested because the amount offered was far below what it was entitled to receive. Much of the amount due was for actual outlay of labor and materials on the part of the contractor, all of which was known to the Government. There was at least $250,000 in pending claims over and above the amount the Government offered. The contractor owed the bank and its income tax, which it could have paid but for the delinquency of the Government. Also, the Government threatened to turn the money appropriated by Congress for this work back to the Treasury if the contractor did not sign the release, which would require the contractor to procure the passage of a special act of Congress for it to get its money. In this situa-

tion, and faced with these threats, the contractor signed the release under protest. It later sued for the balance of the money due it. We held that the release was procured by duress and awarded the plaintiff a judgment. We said in that case:

> * * * The rule as to duress, indicated by the trend of authorities, has receded from its ancient strictness and has been accepted in numerous instances wherein it appeared that the parties were not on equal terms and no alternative existed except to submit to an illegal exaction or suffer irreparable injury to business.

The Supreme Court in Swift Company v. United States, 111 U.S. 22, 28–29, [4 S.Ct. 244, 28 L.Ed. 341] a case involving an illegal exaction by officials of the Internal Revenue Department, used this significant language:

> "The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law and could only do as they required. Money paid or other value parted with, under such pressure, has never been regarded as a *voluntary act* within the meaning of the maximim, *volenti non fit injuria.*" *Id.* at 83–84.

> * * * * * *
> * * * The contract provided that the Navy Department should pay for the work done within thirty days. The defendant did not comply with this provision and it was only because of this, which resulted in the plaintiff being faced with financial disaster and irreparable loss, that the defendant was able by its failure to fulfill its agreement to exact from the plaintiff an unconscionable release of all claims regardless of their merit. But for the failure of the defendant to fulfill its definite and clear promises under the contract, plaintiff could very well have refused to sign the release. In cases

of this kind the defendant should not be permitted to take advantage of its own failure to perform a solemn contract obligation in order to exact from the other parties to the contract a surrender of rights which he would not otherwise be compelled to give up. *Id* at 93.

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* It was the department's duty under the contract to make final payments for work performed when the work was completed on each vessel designated and take a release as to that vessel, and if the department had exhibited the same degree of zeal in making settlements, as the contract required, as it did exhibit in procuring the final release involved, this plaintiff would not have been brought to the brink of bankruptcy and compelled by a chain of circumstances, not of its own making, to do what it did. *Id.* at 95.

We hold that the facts in the instant case show that the plaintiff signed the supplemental agreement because of the duress and coercion on the part of the Government. Consequently, the agreement is not binding on the plaintiff.

█ We conclude that the rights of the parties must be determined without regard to the supplemental agreement. This being true, the Suspension of Work clause (paragraph SP 1–12) of the contract becomes important.[6] This clause provides that the contractor shall be entitled to an equitable adjustment in the contract price if a suspension is for an unreasonable length of time not due to the fault or negligence of the contractor and causes additional expense or loss to the contractor. It is our opinion that under the facts and circumstances of this case the delay was for an unreasonable length of time, was not due to the fault or negligence of the contractor, was for the convenience of the Government, and caused additional expense or loss to the contractor. All of the prerequisites for the issuance of a suspension of work order by the contracting officer were present. We think it should have been issued.

The situation here is much like that in the case of T. C. Bateson Constr. Co. v. United States, *supra*. There the Government delayed the contractor 38 days by causing a strike when it required the contractor to use non-union employees. The contractor sued for delay damages, claiming that the Government should have issued a suspension of work order and made an equitable adjustment of the contract price. We said in that case:

In this posture of the case, our opinion is that the provisions of Article GC–11 [suspension of work clause] are brought into operation. The Government's action demonstrates that, knowing all the consequences, its determination to use civil service employees which caused the strike could only be for the convenience of the Government. Under these circumstances, when it did cause delay and additional expense and since it was not the fault of the contractor, we think the contracting officer should have suspended the work and an equitable adjustment of the contract price should have been made under Article GC–11. Failing in this, we think the Government is liable. *Id.* 162 Ct.Cl. at 187, 319 F.2d 135 at 160.

We reach the same conclusion here that we did in that case. The contracting officer should have issued a suspension

6. SP 1–12 SUSPENSION OF WORK

The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time, causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly.

of work order and made an equitable adjustment of the contract price with the contractor. Since this was not done, the Government is liable.

The liability of the Government here where no suspension of work was issued, but should have been, is the same as it would have been if it had been issued. A case that illustrates the latter situation is the case of Morrison-Knudsen Co. v. United States, 184 Ct.Cl. 661, 397 F.2d 826 (1968). That case, like the one before us, involved a contract for work on a project in Alaska. The contractor was required to do the grading, drainage, and related construction work on a 45 mile segment of an existing roadway. The contract required the work to be completed by November 15, 1954, before the onset of severe winter weather in that part of Alaska. During the progress of the work, the Government made various changes in the contract which delayed the contractor. On October 26, 1954, the Government issued a suspension of work order on the project until further notice because of severe weather conditions which had frozen the subgrade and had produced six inches of snow on the roadway. The work was resumed the following spring and finished in about three weeks. The contractor contended that he could have completed the contract on time if the Government had not delayed him. He sued for damages resulting from the delay and suspension of work. We held in that case:

> * * * Completion of the contract having thus been delayed through fault of the defendant, it is liable for damages incurred by plaintiff as a result of prolongation of the work into the 1955 construction season. See e.g., Jefferson Construction Co. v. United States, 183 Ct.Cl. 720, 392 F.2d 1006 (1968); George A. Fuller Co. v. United States, 69 F.Supp. 409, 411, 108 Ct.Cl. 70, 94 (1947); Donald M. Drake Co. v. United States, 153 Ct.Cl. 433,

440 (1961); Speck, Delays-Damages on Government Contracts, 26 G.W.L. Rev. 505, 518 et seq. (1958). Id. 184 Ct.Cl. at 706–707, 397 F.2d at 854.

██ We think these principles are applicable to the case before us even though the Government did not stop the work of the contractor by a suspension of work order as authorized by the contract. It accomplished the same purpose for its own convenience by forcing the contractor to agree to the supplemental agreement by the coercion and duress discussed above. The plaintiff is entitled to recover whatever damages it suffered by reason of such delay.

██ We come now to consider the question of equitable adjustment or damages claimed by the contractor. It has presented its claim on the basis of the total cost theory.[7] In this connection, it shows that it spent $79,905.22 more than the original contract price of $487,-775 because of the delay aforesaid. It contends that it is entitled to recover this amount, plus overhead and profit, on the original contract price, as well as on the additional costs, plus the cost of its bond and taxes, all in the total sum of $239,316.98 over and above the original contract price of $487,775. The defendant admits that an Air Force audit shows that plaintiff spent $79,905.22 more than the contract price of $487,775, but says these are only total cost figures and denies that plaintiff is entitled to recover that much even if it is entitled to a recovery in some amount. It points out that the Board made no determination as to the amount of plaintiff's damages and that under the Wunderlich Act, damages must be found in the first instance by the Board. We agree with the defendant. The amount of an equitable adjustment is a pure question of fact. United States v. Callahan Walker Constr. Co., 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942). The total cost theory has never been favored by this court if there is any other way to determine the

7. See Rubin, The Total Cost Method of Computing An Equitable Adjustment—An Analysis, 26 Fed.B.J. 303 (1966).

amount of the equitable adjustment. We said in Phillips Constr. Co. v. United States, 394 F.2d 834, 184 Ct.Cl. 249 (1968):

> * * * [T]his method is not preferred by the court and will be used only in an extreme case. The reasons for its reluctance to apply the total cost approach are explained by the court in a much-quoted excerpt from its opinion in F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1955). The court said:
>
> > This method of proving damage is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff's bid was accurately computed, which is not always the case, by any means.
>
> Our opinion in Great Lakes Dredge & Dock Co. v. United States, *supra*, 119 Ct.Cl. 504, 96 F.Supp. 923 (1951), cert. denied, 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708 (1952) ] was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards. 130 F.Supp. 400, 131 Ct.Cl. 511. *Id.* at 260–261, 394 F.2d at 841.

Again, we held in WRB Corporation v. United States, 183 Ct.Cl. 409 (1968):

> For claims 22 and 26, plaintiff's submission is the "total cost" standard (the difference between actual expenses and bid or estimated costs). This theory has never been favored by the court and has been tolerated only when no other mode was available and when reliability of the supporting evidence was fully substantiated. See Turnbull, Inc. v. United States, 180 Ct.Cl. 1010, 1025–1026, 389 F.2d 1007, 1015 (1967); J. D. Hedin Construction Co. v. United States, 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–247 (1965); River Construction Corp. v. United States, *supra*, 159 Ct.Cl. [254] at pages 270–271; Oliver-Finnie Co. v. United States, 150 Ct.Cl. 189, 200, 279 F.2d 498, 505–506 (1960); F. H. McGraw & Co. v. United States, 131 Ct.Cl. 501, 510–512, 130 F.Supp. 394, 399–400 (1955). The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses. See J. D. Hedin Construction Co. v. United States, *supra*, 171 Ct.Cl. at pages 86–87, 347 F.2d at pages 246–247; Oliver-Finnie Co. v. United States, *supra*, 150 Ct.Cl. at pages 197, 200, 279 F.2d at pages 505–506; F. H. McGraw & Co. v. United States, *supra*, 131 Ct.Cl. at page 511, 130 F.Supp. at page 400. *Id.* at 426.

It is clear that we cannot make initial findings of fact on the amount of plaintiff's recovery. The case must be returned to the Board so that it may make this determination. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430–431, 86 S.Ct. 1539, 16 L.Ed. 2d 662 (1966).

Accordingly, we hold that plaintiff is entitled to recover on its claim for delay damages and judgment is entered for plaintiff thereon, and to that extent its motion for summary judgment is granted, the amount of recovery to be determined in the first instance by the Armed Services Board of Contract Appeals. Proceedings in the case in this court are hereby suspended for a period of 120 days from this date for such Board determination, and the case is returned to the Board for this purpose. The plaintiff will comply with Rule 100 and the appropriate provisions of the General Order of the court of April 1, 1968, implementing it. Upon the conclusion of the proceedings of the Board, the plaintiff will report the result to the court and the parties will take further action for the final disposition of the case in this court. The motion for summary judgment of defendant is denied.