**EMERSON–SACK–WARNER
CORPORATION**

v.

**The UNITED STATES.**

**No. 2–68.**

United States Court of Claims.

Oct. 17, 1969.

———◇———

.Lola Dickerman, Boston, Mass., attorney of record for plaintiff. Leon J. Glazerman, Boston, Mass., of counsel.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to make recommendation for conclusions of law pursuant to the order of reference and Rule 99(c) [since September 1, 1969 Rule 166(c)]. The commissioner has done so in an opinion and report filed on June 12, 1969 wherein such facts as are necessary to the opinion are stated. Neither party filed a request for review of the commissioner's opinion and report within the time provided therefor pursuant to the rules of the court. On August 20, 1969 defendant filed a motion to adopt the commissioner's report without modification. Since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's motion to adopt, filed August 20, 1969, and adopts the same as the

basis for its judgment in this case without oral argument. Accordingly, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied and judgment is entered for plaintiff in accordance with the opinion with further proceedings in this court to be stayed pursuant to the provisions of Rule 167 [prior to September 1, 1969, Rule 100] for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.

## OPINION OF COMMISSIONER

WOOD, Commissioner:

On January 25, 1957, plaintiff, a Massachusetts corporation, entered into a contract with the United States Navy whereby plaintiff undertook to fabricate and supply to the Navy 1,433 emergency first aid boxes. This case, before the court on plaintiff's motion and defendant's cross-motion for summary judgment on the administrative record, involves a claim, under the Changes Article of the contract, for an equitable adjustment for alleged reworking of the first aid boxes.

The Armed Services Board of Contract Appeals held that plaintiff's claim was barred by an accord and satisfaction,[1] and defendant says correctly so. For the reasons appearing below, it is concluded that the Board erred in so holding.

The facts stated in the narrative which follows were for the most part found by the Board. Others not specifically so found rest on undisputed evidence. Cf. Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 387, 187 Ct.Cl. 15, 24 (1969), petition for cert. filed July 25, 1969, No. 389; Ray D. Bolander Co. v. United States, 186 Ct.Cl.

398, 409 (1968); Koppers Co. v. United States, 405 F.2d 554, 559, 186 Ct.Cl. 142, 150 (1968).

The first aid boxes, described in the contract as

### CLASS 6530

*BOX. FIRST AID. FIXED. WEATHERTIGHT. ALUMINUM. GRAY ENAMEL FINISH. DULL NICKEL-PLATED FITTINGS. DIMENSIONS: HEIGHT 20″, WIDTH 16½″, DEPTH 8¼″*

were to be built in accordance with Bureau of Ships Drawing S 3702–F–921,917 Alteration A, and Navy Department Specification MIL–F–902, "Furniture and Accessories; Aluminum (Shipboard Use)." They were designed to be attached to interior and exterior bulkheads of Navy ships. The unit and total contract prices were, respectively, $26.40 and $37,831.20. The contract called for delivery of 250 boxes within 150 days from the date of the contract (June 24, 1957), and the remainder within 220 days from the date of the contract (September 2, 1957).[2]

The contract was awarded by the Navy General Stores Supply Office, Philadelphia, Pennsylvania, and was administered by two contracting officers who could, and did, act individually or together. Inspection was made by the Inspector of Naval Material (INSMAT), Boston, Massachusetts, at plaintiff's plant in Somerville, Massachusetts.

Among the components of the finished product were a cover, a body, a cover stiffener, a body stiffener, a rubber gasket, a gasket retainer, hinges, and catch fasteners. The body and cover were joined by two hinges on one side, and held closed by two catch fasteners on the other. The rubber gasket was fastened to the cover stiffener so that,

---

1. ASBCA No. 9164, 64 BCA ¶ 4483 (1964). The Board allowed recovery on two other claims not now in question, including a claim for "research and development" mentioned hereinafter.

2. By a contract modification prior to that held by the Board to bar the claim, the original delivery dates were extended to December 31, 1957. "As consideration for extending the delivery date," there was a 2 percent reduction in contract price.

when the box was closed, the gasket was compressed between the cover stiffener and the body stiffener.

The contract item description of the first aid boxes included the word "WEATHERTIGHT." And, the contract drawing contained the following note:

3 BOX TO BE TESTED FOR WEATHER TIGHTNESS BY SPRAYING WITH HOSE. PRESSURE AT NOZZLE NOT TO EXCEED 25 POUNDS.

Neither the duration of the test, the volume of water per minute, the distance at which the nozzle should be held, the position (or positions) of the box during testing, nor the allowable amount of water (if any) were specified.

On December 12, 1957, plaintiff presented 88 boxes for inspection. Plaintiff had conducted its own weathertightness test by mounting the test boxes against a wall and spraying them with a hose. The INSMAT inspector rotated one of the boxes, spraying all sides and corners. So tested, this box admitted about three ounces of water. The boxes were rejected for, *inter alia*, failure "to pass water test outlined on [drawing]." Immediately after this statement, the INSMAT inspector added the words "(To be clarified)."

On December 13, 1957, at INSMAT's request, plaintiff sought clarification from the contracting officer as to the method of conducting the spray test and the amount of water, if any, which would be allowed for acceptance.[3] On December 24, 1957, by endorsement to plaintiff's letter of December 13, 1957, to the contracting officer, INSMAT "requests test criteria relative to conducting weather proofness testing as indicated in the basic letter."

On January 2, 1958,[4] plaintiff was orally informed by the contracting officer that *no* water should enter its boxes on testing; the contracting officer also suggested that plaintiff use certain sealants or caulking compounds. Two sample boxes were so prepared and tested on January 3, 1958. Plaintiff communicated the results to the contracting officer by letter dated January 6, 1958, as follows:

Complying with your request of Thursday, January 2, 1958, we submit the following:

1—Two (2) unpainted First Aid Cabinets had the spaces between the body pc#1 and the body stiffener pc #2, also the cover pc#3 and the cover stiffener pc#4 * * * caulked * *

2—The gasket pc#2 was checked for seating on body stiffener pc#2.

3—All rivets and connections were rechecked.

4—Under the supervision of [INSMAT inspectors], the following test was conducted as instructed.

5—Water pressure at 25# at the nozzle and a spray equal to three (3) gallons per minute, at a distance of three (3) to four (4) feet and a time period of five (5) minutes, with the spray rotated over the units, upon opening we found the amounts of water contained therein to range from a teaspoon to approximately 2 ounces. It was agreed that it was impossible

3. Plaintiff's letter (via INSMAT) stated that the boxes had "met with approval with the exception of:
  Note: Number 3 on subject drawing quote, 'Cabinet to be tested for weather tightness by spraying water pressure at nozzle not to exceed 25 pounds.' To Inspector of Naval Material, it is insufficient information and is withholding [*sic*] approval pending decision."
  Plaintiff's letter also stated that approximately three ounces of water had entered the box "being rotated"; that

INSMAT had requested advice as to the "distance between cabinet and spray," the length of time of the test, the position of the box, and the allowable amount of water for acceptance; and that "All the above are not a requirement as to the plans and specifications on subject contract."

4. By this time, the contract delivery date (extended to December 31, 1957) was past.

to determine as to how the water could get in.

6—* * * since water was in the unit, and if it entered from the exterior, than [sic] if we fill the cabinet with water it should come out at the same rate. The cabinet was filled to the top of the body, closed and rotated and there was no visible sign of water coming out. * * * Since the question of water tightness has arisen, it was agreed that assembly be held back pending a decision.

On January 6, 1958, the contracting officer sent this speed letter to INSMAT, with a copy to plaintiff:

Refer your first endorsement on contractor's ltr dtd 13 Dec 1957.

General note 3 * * * concerning weather tightness test requires that the first aid box remain water tight after spraying with a hose having not more than 25 lb. pressure at nozzle. The nozzle should be held 3 to 4 feet from the box and the box rotated to expose all sides to the spray for several minutes. * * *

In order to produce the desired results under the applicable drawing it is suggested that some type of commercial sealer be used between pieces 1 and 2 where they are joined and if necessary between pieces 3 and 4 above the rubber gasket. * * *

In light of * * * the necessity of performing this additional work to render the boxes satisfactory, it is requested that this office be advised as soon as possible of a realistic delivery date for the contract material. Any additional costs incurred by the contractor should also be received by the Inspector of Naval Material and forwarded to GSSO that an appropriate modification to the contract can be issued.

The material under this contract is urgently required * * * delivery should be expedited by whatever means possible. * * *

Plaintiff reasonably construed the contracting officer's telephone conversation of January 2, 1958, and the January 6, 1958, speed letter as a directive to conduct experiments for the production of a box which would be watertight against the spray test specified by the contracting officer. It prepared 14 sample boxes, using different methods of fabrication and assembly and various caulking compounds and sealants, and on February 10, 1968, reported to the contracting officer as follows:

Complying with your request of your speed letter of 1/6/58, we have given full consideration and various attempts to solve the water tightness of the subject First Aid Boxes.

We have tried the methods you suggested and found them to be unsatisfactory, and after many tries, we have finally completed a sample unit, which we believe is a minimum alteration to produce results. This unit was tested and inspected and was found to be satisfactory.

In accordance with these tests and approval, we submitted this unit for your inspection at my recent visit to G.S.S.O.[5] and further complying with your request we are submitting the costs that will be involved in the various stages of completion which are hereby attached.

We trust that * * * we will receive an early reply so that we can commence with completion of the subject contract.

Using the Board's words, "The cost breakdown attached to the letter detailed items of work and materials which would supposedly be required to produce watertight boxes." To place 1,143 first aid boxes, in various stages of assembly, into the condition of the sample, plaintiff requested $21.22 per unit; for 80 boxes completed except for paint, it requested $28.35 per unit; and for 210 completed boxes it requested $32.20 per unit. In addition, it requested that the sum of

5. On January 30, 1958.

$.95 be added to the unit price of each box as amortized labor and material for reworking and testing the 14 sample boxes.

Plaintiff's February 10, 1958, letter to the contracting officer was sent via INSMAT. By endorsement dated February 13, 1958, INSMAT advised the contracting officer that both the proposed costs for reworking the boxes and those for experimentation were excessive. It recommended that "the first aid boxes be accepted without the proposed modifications by the contractor. Note 3 * * * should be amended to allow the entrance of a small amount of water (3 to 5 ounces) into the boxes during the test."

In the meantime, however, on February 12, 1958, the contracting officer called plaintiff's president, Mr. Silverman. The contracting officer made the following record of the telephone conversation:

> [The contracting officer] called Mr. Silverman with reference to his proposal to amend contract N155–27812 to allow the payment of additional changes necessary to provide first aid boxes under the subject contract which would be watertight. [He] told Mr. Silverman he considered the proposal to be way out of line and the costs involved exorbitant. [The contracting officer] suggested that the contract be amended to delete the watertight requirement since it is in conflict with the applicable drawing, and to provide first aid boxes which are made strictly in accordance with the drawing and with the highest degree of workmanship possible in order to restrict the amount of water that may enter the boxes to an absolute minimum.

[The contracting officer] also requested that delivery under the subject contract be completed by 31 Mar 58, with all shipments being accelerated at the fastest rate possible. Mr. Silverman said he would agree to this action. A contract modification embodying this agreement will be sent to the contractor on 13 Feb 58 for his acceptance.

Under date of February 19, 1958, Contract Modification No. 4 was sent to plaintiff for signature. This document provided in pertinent part that:

> *     *     *     *     *     *
>
> The above numbered contract is hereby amended, as of the above date, in the following respects only:
>
> to provide that the material shall be fabricated in accordance with BuShips Drawing S3702–02917 [6] Rev. A of 20 Jan 1953 and shall be constructed with the highest degree of workmanship so as to restrict the entrance of water to an absolute minimum when tested in accordance with Note 3 [7] of the above drawing.
>
> The delivery date of the contract shall be changed to read 31 March 1958 in lieu of 31 December 1957 since it has been determined by the Contracting Officer that the contractor was excusably delayed.
>
> *     *     *     *     *     *

No provision for change in contract price was included.

On February 27, 1958, plaintiff wrote to the contracting officer (again via INSMAT) as follows:

> We are in receipt of Modification#4 * * * and * * * note the added requirements to our original contract, quote 'and shall be constructed of the highest degree of workmanship so as

---

6. The discrepancy between this and the contract drawing (BuShips Drawing S 3702–F–921, 917, Alteration A) is not mentioned by the Board or by the parties.

7. When asked to explain the wording of Modification No. 4, the contracting officer testified that it was used because "we thought we might get a box that allowed only one ounce and that would be more desirable." Plaintiff still had to spray test "in accordance with Note 3" as the contracting officer (on advice from the Bureau of Ships) had construed it.

to restrict entrance of water to an absolute minimum'. Inasmuch as our contract requires that we manufacture the First Aid Boxes in accordance with drawing S3702–921917 [sic] and specifications noted, we cannot assume any responsibility as to the amount of water that will be contained after the spray test.

The spray test has still not been clarified as to the amount of water sprayed per minute and our present testings may be far in excess of requirements. If our interpretation stated above is incorrect, please advise at the earliest possible date.

Inasmuch as we have been experimenting in making the subject First Aid Boxes water tight in accordance with your requirements from December 12, 1957 to February 18, 1958 and samples submitted thereof along with loss of time for the fabrication which had been held up until decision of modification #4. Whereupon we have to retool and set in production in accordance with our original procedure. We are therefore entitled to reimbursement of costs in connection with the above.

We requested a 60 day extension from the day of authorization to complete the contract, we have been allowed only 30 days which we feel will be short of our requirements, since our experience in loss of time has been the amount of 120 working days.

On March 3, 1958, the contracting officer replied:

* * * Modification #4 * * * was intended to confirm the matters discussed and the agreement reached between [plaintiff's president and the contracting officer] during their meeting of 30 Jan at the General Stores Supply Office, and subsequently discussed in the telephone conversation of 12 Feb 1958. You had stated at that time that you would require an extension of the subject contract until 31 Mar 1958, in order to complete shipment of the first aid boxes. The language of modification #4 is intented to do nothing more than reemphasize the requirements of the applicable specification, namely that workmanship of the highest caliber shall be used in constructing the first aid boxes. If this is accomplished, then the entrance of water into these units will be restricted in the highest degree possible. This is evidenced by the fact that previous experience with the testing of these units has shown that only 3 to 4 ounces of water have entered the box without the use of any additional sealers. As was previously discussed, no reimbursement will be allowed for the expenses incurred by the contractor in producing an item which is completely water tight in accordance with the Contracting Officer's requirements. It has been the Government's contention throughout, that it is your responsibility to supply first aid boxes which are completely water tight in accordance with the Government's interpretation of the applicable specification. The decision to waive the water tight requirement, requiring in lieu thereof material manufactured strictly in accordance with the BUSHIPS drawing in such a manner as to restrict the entrance of water to a minimum, was made in an effort to expedite the delivery of subject material and to resolve the alleged problems of inconsistency in the specifications. This negotiation was conducted with you and your agreement to the decision manifested in modification #4 had been previously indicated.

No further action will be taken by the Contracting Officer to grant additional relief either by way of extending the due date of the contract or increasing the unit price of the material involved. Any incidental expenses incurred by the contractor must be taken as consideration for the Government's granting of the deviations stated in modification #4.

In the event that it is your intention not to sign modification #4 and com-

ply with the requirements contained therein, you are requested to notify the Contracting Officer of this fact by 13 Mar 1958, at which time action will be taken to terminate the contract for default in accordance with the provisions of para 11(a) (ii) of the General Provisions entitled Default.

Plaintiff subsequently signed Modification No. 4 (the exact date is neither found by the Board nor clear), proceeded to completion and delivery of the first aid boxes over the next several months, and, after "completion or substantial completion * * * filed claim for the alleged extra costs of research and development and of reworking the boxes."

As to plaintiff's research and development claim, the Board held that Modification No. 4 was not "intended as an accord or release of [plaintiff's] claim for adjustment in price for making the 14 experimental boxes," and that this claim therefore required consideration on the merits. Observing that from the record "weathertight" was not a word of art, that the test requirements in plaintiff's contract were not complete, and that there was no evidence of standard commercial practice, the Board found plaintiff's "contention that the boxes were to be spray tested while fastened to a wall, in the manner in which they would be secured to a ship's bulkhead, to be reasonable," and that the "additional [test] requirements imposed by the Government constituted a change." The Board also said that

> * * * a box made of the specified materials, and formed and assembled in the manner shown on the contract drawing, could not meet that test without the admission of water. * * * with the imposition of the Government's test, the contract had become impossible of performance without improvement · in design.

[Plaintiff] could not prepare an estimate of the cost of manufacturing a waterproof box until it had designed and made one. This was extra work for which [it] is entitled to an equitable adjustment in the contract price.

The sum of $1,361.35 was allowed on this claim, and is not here in question.

The Board concluded, however, that plaintiff's claim for "reworking" the 1,433 first aid boxes was barred by Modification No. 4. Prior to executing that Modification, the Board said,

> The parties were in disagreement as to the weathertight requirements of the contract. Pressed by an urgent need for the boxes, the Government agreed to waive its interpretation of these requirements in return for a new, firm delivery date. The [plaintiff] knew that the contracting officer considered the change to be a relaxation of the contract requirements and that he had specifically and in writing refused to consider either additional payment or more time than was stated in the change order. [Plaintiff] received a valuable consideration in the form of a time extension, and there was a relaxation of the Government's interpretation of other provisions of the contract. Thus the essentials of an accord and satisfaction were all present, that is, a proper subject matter, competent parties, an assent or meeting of the minds of the parties and a consideration * * *. Having accepted the contract modification unconditionally [plaintiff] is precluded from further monetary adjustment thereon.

Finding "no persuasive evidence of over jealous inspection," [8] the Board denied plaintiff's claim.

Preliminarily, there is a difference "between an advance agreement to be

---

8. Plaintiff contended, administratively, that Modification No. 4 did not preclude an equitable adjustment for reworking the first aid boxes, but that, in any event, the contracting officer "repudiated it by requiring that [plaintiff] furnish a watertight box * * *," refusing "to accept [plaintiff's] boxes until they were made watertight."

bound by the decision of the contracting officer and the Board respecting an equitable adjustment and the power, without being bound prior to agreement, mutually to settle differences." United States v. Utah Constr. & Mining Co., 384 U.S. 394, 412, n. 11, 86 S.Ct. 1545, 1555, 16 L.Ed.2d 642 (1966). And, there is a difference between an administrative decision "respecting an equitable adjustment" and a holding that the contractor and the contracting officer have agreed "mutually to settle differences." [9]

In their briefs, the parties have assumed that in litigation involving an administrative decision that a claim arising under a contract is barred by accord and satisfaction, the "reviewing court is limited to the administrative record * * *." [10] Plaintiff, alleging that relief is sought "exclusively under the provisions of the Wunderlich Act * * *," [11] contends that the Board erred as a matter of law in characterizing Modification No. 4 as an accord and satisfaction, and that many of the "findings" upon which the Board's decision rested were erroneous as a matter of law or unsupported by substantial evidence; defendant, that the Board's conclusion is "correct in law and fact" and should therefore be upheld. Thus are the issues cast in Wunderlich Act terms. Cf. H. L. C. & Associates Constr. Co. v. United States, 367 F.2d 586, 592, 176 Ct.Cl. 285, 296 (1966).

It is necessary here only to recognize the difference noted above, deferring to another time any explication it may require. Both parties have moved for summary judgment on the administrative record, and that record permits decision on the motions. Cf. Urban Plumbing & Heating Co. v. United States, supra; Cannon Constr. Co. v. United States, supra note 9. In concluding that the doctrine of accord and satisfaction precluded plaintiff, the Board "was in error, as a matter of law * * *." H. L. C. & Associates Constr. Co. v. United States, supra; cf. Corbetta Constr. Co. v. United States, supra note 9; Ray D. Bolander Co. v. United States, supra.

The Board held in effect that the parties intended, and by Modification No. 4 mutually agreed, to settle and compromise their "disagreement as to the weathertight requirements of the contract," including all claims [12] for making acceptable boxes arising from the constructive change in spray testing methods imposed on plaintiff by the contracting officer, at no change in contract price. The agreement does not deserve, and will not support, such a construction.

Modification No. 4 supposedly had its genesis in a telephone conversation of February 12, 1958, between the contracting officer and plaintiff's president.[13] The contracting officer's memo-

9. *Compare* Corbetta Constr. Co. v. United States, 408 F.2d 450, 187 Ct.Cl. 409 (1969); Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 187 Ct. Cl. 15 (1969) petition for cert. filed July 25, 1969, No. 389; Construction Service Co. v. United States, 357 F.2d 973, 174 Ct.Cl. 756 (1966); Cannon Constr. Co. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963); Tombigbee Constructors v. United States, Ct.Cl.No. 194–65 (Op. of Commr. Schwartz, filed April 1, 1969, p. 27).

10. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 425, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); *see also* United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

11. 68 Stat. 81, 41 U.S.C. §§ 321, 322.

12. Except for research and development, for which the Board allowed recovery.

13. In the contracting officer's letter of March 3, 1958, quoted *supra*, he refers to an "agreement reached" on *January 30, 1958*. Plaintiff's proposed costs for making the boxes watertight, under the government test, were not submitted to the contracting officer until February 10, 1958. Thus, any "agreement" on January 30, 1958, could only have been as to a time extension, the subject mentioned by the contracting officer in the sentence following his reference to the "agreement reached."

randum of that conversation reflects his suggestion "that the contract be amended to delete the watertight requirement *since it is in conflict with the applicable drawing* * * *." In a separate paragraph, the contracting officer recorded his request of plaintiff for delivery by March 31, 1958, and plaintiff's agreement to "this action." The spray testing *method,* constructively changed by the contracting officer more than a month earlier, was not mentioned at all.

In the February 12, 1958, memorandum, the contracting officer in effect admitted, and the Board found, that—given the method of testing he was requiring (and continued to require)—a first aid box constructed in accordance with the contract drawing "could not meet that test without the admission of water." He was aware of, and deemed "exorbitant," plaintiff's proposed costs for making the boxes "waterproof" when so tested. Rather than pay those costs, he decided to "delete the watertight requirement since it is in conflict with the applicable drawing." Modification No. 4 represented his effort at such a deletion. And, it also granted plaintiff an extension of time for delivery to March 31, 1958, "since it has been determined by the Contracting Officer that the contractor was excusably delayed." [14]

In Brock & Blevins Co. v. United States, 343 F.2d 951, 955, 170 Ct.Cl. 52, 58–59 (1965), this court discussed at some length the doctrine of accord and satisfaction:

Discharge of a claim by accord and satisfaction 'means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim.' 6 Corbin, Contracts, § 1276 (1962). An accord and satisfaction has been aptly described in the following manner:

The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration. And its most common pattern is a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute. * * *

Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73, 76 (10th Cir. 1949), cert. denied 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950). * * *

Modification No. 4 simply does not fit that mold: it plainly was not "a mutual agreement * * * in satisfaction of a claim or demand which is a bona fide dispute." Brock & Blevins Co. v. United States, *supra. See also* Restatement, Contracts, § 417; Louis Schlesinger Co. v. Kresge Foundation, 388 F.2d 208, 210 (3d Cir. 1968), cert. denied 391 U.S. 934, 88 S.Ct. 1847, 20 L.Ed.2d 854 (1968); Puget Sound Pulp & Timber Co. v. O'Reilly, 239 F.2d 607, 610 (9th Cir. 1956). At most, there was agreement that "a change was necessary in order to achieve performance of the contract," [15] and that plaintiff had been "excusably delayed" for at least thirty days.

Nothing in the contracting officer's February 12, 1958, memorandum, Modification No. 4, subsequent correspondence between the parties prior to the execution of the Modification, [16] or the

---

14. On January 6, 1958, six days after the then delivery date, the contracting officer had asked that he be advised of "a realistic delivery date for the contract material" in light of, *inter alia,* "the necessity of performing additional work to render the boxes satisfactory." *Cf.* Bailey Specialized Buildings, Inc. v.

United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968).

15. Kings Electronics Co. v. United States, 341 F.2d 632, 638, 169 Ct.Cl. 433, 443 (1965).

16. Plaintiff's letter of February 27, 1958, and the contracting officer's reply of March 3, 1958, quoted *supra.*

record, justifies a holding that Modification No. 4 constituted a discharge of plaintiff's claim by accord and satisfaction. *See* Corbetta Constr. Co. v. United States, *supra* note 9; *Cf.* Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968); Paccon, Inc. v. United States, 399 F.2d 162, 185 Ct.Cl. 24 (1968); Kings Electronics Co. v. United States, *supra.* Such a holding would extend a sound, and judicially favored, doctrine far beyond its proper scope, and must be rejected.

In 1964, before the Board, the contracting officer did testify, in substance, that his February 12, 1958, memorandum documented an "agreement" with plaintiff "as clear as I could spell it out * * *." He then described the "agreement": on February 12, 1958, "I offered this proposal whereby we would amend this contract to permit the weather tightness to be waived to the degree a certain amount of water could be allowed in the boxes provided the highest degree of manufacturing was applied to these boxes and in exchange he would give us a firm delivery date and we would amend the contract to that delivery date for a price consideration which was specified."

This testimony, some six years after the event, was not cited by the Board, and properly so. For patent, and significant reasons, it provides no support for the Board's conclusion: it is inconsistent with the February 12, 1958, memorandum, particularly in its omission of the reason given in 1958 for "waiving" the "weather tightness" requirements; it contradicts the contracting officer's March 3, 1958, letter that an "agreement" had been reached on January 30,

1958; and, it erroneously alludes to a "specified" *price* consideration for extension of the delivery date. Such testimony, some years after the event, "is necessarily based on faulty recollection." Corbetta Constr. Co. v. United States, *supra,* 408 F.2d at 460, 187 Ct.Cl. at 426 (finding 30); *see also* Sternberger v. United States, 401 F.2d 1012, 185 Ct. Cl. 528 (1968).

The conclusion reached herein above makes it unnecessary to reach other contentions advanced herein, with one exception: defendant's argument that, in any event, plaintiff has shown no entitlement to additional compensation, since its reworking of the first aid boxes was merely work performed under the contract pursuant to relaxed specifications. Plaintiff replies that the spray test required by the contracting officer was imposed throughout the contract,[17] that the Board found this test "required the redesign of the boxes," and that plaintiff necessarily reworked the boxes to the "new design." [18]

■ The Board disposed of plaintiff's claim on an erroneous ground, without making any findings as to plaintiff's rights, if any, but for the asserted "accord and satisfaction." *Cf.* Bell v. United States, 404 F.2d 975, 186 Ct.Cl. 189 (1968); Urban Plumbing & Heating Co. v. United States, *supra.* The contracting officer's imposition of "additional test requirements" constituted a change.[19] By modification No. 4, plaintiff's contract was further changed. The determination of the equitable adjustment, if any, due plaintiff for the changes cannot be made in the first instance in this court. United States v.

---

17. Defendant concedes this, but urges that the test was "given pursuant to contractual authority * * *." The test became part of the contract only by constructive change, for which no equitable adjustment has been made.

18. Defendant's contention disregards the change in spray testing *methods*; plaintiff, on the other hand, somewhat distorts the Board finding, and appears to ignore

the change in acceptable test *results.* The question whether the net effect of the two changes was to leave plaintiff, in substance, in the position occupied prior to any change, is not now before the court; the single issue here is that of accord and satisfaction *vel non.*

19. Defendant does not question the Board's decision in this, or any other, respect.

Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). "The Board will have to make the determination, either on the present record or after further evidence is produced." Bell v. United States, *supra*, 404 F.2d at 984, 186 Ct.Cl. at 206; *see also* Urban Plumbing & Heating Co. v. United States, *supra*.

It is therefore recommended that plaintiff's motion for summary judgment be granted, that defendant's cross-motion for summary judgment be denied, and that further proceedings be stayed pursuant to Rule 100 (since September 1, 1969, Rule 167) for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.